# Wayne *versus* Commercial National Bank.
## Cope *versus* Same.
## Miller *versus* Same.

| 52 | 343 |
| f195 | 450 |

| 52 | 343 |
| 205 | ²371 |
| 22 SC | ²255 |

1. A teller of a bank was a defaulter to it at the time sureties entered into a new bond for the faithful performance of his duties, &c. *Held*, if the bank fraudulently concealed that he was then a defaulter, the sureties would not be liable for a subsequent default.

2. But where the bank had no reason to suspect the teller, and there was no request by the surety to investigate his accounts, omission of the bank to make such investigation, would not discharge the surety.

3. The teller, having authority to issue " due-bills" for the bank for a special purpose, issued them to raise money for himself; neither he nor his surety could set up a want of power in the bank to issue them: nor that the due-bills were not properly stamped.

4. When the default of the principal would forfeit the bond as to him, it would forfeit it as to the surety.

CERTIFICATES from *Nisi Prius*.

These cases were three actions by The Commercial National Bank of Pennsylvania, one against Edwin R. Cope, one against Edward C. Wayne, and the third against Hiram Miller.

They were on a several bond to the bank, dated February 1st 1865, in which Charles E. Clark was bound as principal in $15,000, and the defendants as his sureties in $5000 each, conditioned that Clark would perform all his duties and fulfil all his trusts as paying teller of the bank.

The declaration alleged as breach of the condition, that the said Clark, on the 1st day of May 1865, failed to apply divers large sums of money, then and there delivered to him, and then and there in his possession, and to render unto the plaintiffs a just and true account of all moneys belonging to the plaintiffs, before and at that time intrusted to him by the plaintiffs, and received by him as such paying teller for and on behalf of the plaintiffs, and then and there became and was then still a defaulter to the plaintiffs in the sum of $398,000.

Clark had been paying teller of the bank for some time before the date of the bond, and at that time was a defaulter to an amount over $300,000. The defalcation had begun a considerable time before. On the 1st of May 1865, Clark's deficiency in his cash was found to be $157,987.78. The next day sixteen due-bills issued by him, but not noted, came in—making the defalcation $398,559.23. He had authority to issue these due-bills, signed by himself alone, from a book furnished him, containing blank bills, with a margin to note the date and amount. He could pay checks on the bank either in currency or by these bills. No note had been made of the bills fraudulently issued. These bills being deposited by the holders in the banks where they had

[Wayne *v.* Commercial National Bank.]

their accounts, were taken in packages to the Clearing House the next day, charged to the bank issuing them, and credited to the bank sending them. When returned to the Commercial Bank they were received and examined by Clark alone.

On the trial (before Strong, J.), these due-bills, unstamped, were offered in evidence, and admitted. They were afterwards stamped, again offered and admitted, and exception taken. The defendants offered evidence that one of these due-bills had remained out for more than a month, to show that they were used as a circulating medium—this offer was rejected. Also, the by-laws of the bank, to show the duties of the cashier and directors, and that if these duties had been performed the defalcation would have been known when the bond was executed. This was rejected, except as to the duties of the paying teller. Also, that the president and cashier did not examine the due-bill book, the packages of due-bills, or count the cash. They also offered to show that the quarterly report of the bank was incorrect; also the record of a suit by the bank against Anspach, in which was an affidavit to hold to bail, averring a conspiracy between Clark and Anspach to defraud the bank, and that Anspach had defrauded the bank, between May 1863 and May 1865, of $235,000 ; that Anspach was arrested and discharged on bail, and the suit against him afterwards discontinued—all which were rejected, for all purposes except as to the affidavit, to show that the officer making it stated that the defalcation commenced before February 1865. To these rulings the defendants excepted.

There was a verdict and judgment for the plaintiff in each case for $5000.

The defendants assigned for error :—

1 and 2. Admitting in evidence the sixteen due-bills before and after they were stamped.

3. Rejecting evidence that one due-bill for $30,000 had been outstanding for one month, and was not referred to in the quarterly report of 2d January 1865.

4. Rejecting the record of the suit against Anspach, except for the purpose of showing the admissions of the officers of the bank as to the origin of Clark's defalcation.

5. Rejecting the quarterly report of the bank 2d of January 1865.

6. Rejecting, except as to the paying teller, the by-laws of the bank.

7. Rejecting evidence that before and after the date of the bond no examination of the packages or due-bill books, and no count of the cash or assets in Clark's hands, were made.

8. Reply to defendants' 3d point, that there was no evidence that the cash, in which Clark ran short on the 1st of May, was in his possession on or after the date of defendants' bond, saying

that there was evidence to support the averment of the declaration.

9. Declining to affirm the defendants' 6th point, to wit: "The plaintiffs cannot recover by reason of due-bills which Clark issued under their authority, because such issue was unlawful, and prohibited by the Act of Congress regulating National Banks, which. provides for the circulating medium, and that no such association ' shall issue post notes, or any notes to circulate as money, other than such as are authorized by that act.' "

10. Declining to affirm the defendants' 7th point, to wit: " That if the said due-bills be not circulating medium, they should have been stamped as due-bills, and for the want of such stamp were invalid and of no effect."

11 and 12. Declining to affirm the defendants' 8th point, to wit: " That Clark having, by authority or license of plaintiffs, issued due-bills which were illegal and void, any improper issue of such illegal bills is not a breach of the bond sued upon. The bond was not intended to cover the performance of illegal acts done with the consent or by the direction of the bank or its officers ; as the bond contemplates only the performance of lawful duties, the defendants cannot be held for the performance of acts prohibited by law, though directed by plaintiffs." Saying, " It assumes what cannot be assumed legally, and it is immaterial to these cases ; I admit the bond does not cover illegal acts of Clark which he was directed by the bank to do."

13. Declining to affirm the defendants' 9th point, viz.: " That the due-bills were invalid and of no effect, by reason of their being unlawfully issued, and also by reason of their being unstamped ; and for either of these grounds the plaintiffs were under no obligation to pay them."

14. Declining to affirm the defendants' 10th point, to wit: " The payment by the bank was voluntary, without notice to the sureties, and such payment does not bind the latter."

15. Reply to the defendants' 13th point, which was, the defendants are not liable for Clark's improper use of an authority granted by plaintiffs to him to perform illegal acts. Reply, " There is no evidence that the plaintiffs gave Clark authority to perform illegal acts ; and this point is irrelevant."

16. Declining to affirm the defendants' 14th point, which was: " It having been proved that Clark was a defaulter to the bank, at and for a long time prior to the date of the bond, and it not appearing that defendants were informed thereof by plaintiffs, the absence of such information discharges defendants, and this is equally the case whether the plaintiffs had and purposely withheld that information or were ignorant of the fact, where all the sources of information were within their power, so that with ordinary diligence, and in the performance of the

duties imposed upon their officers, they must have learned of the defalcation."

17. Replying to the 14th point: "The existence of a default prior to February 1st 1865, unknown to plaintiffs, will not avail these defendants as a defence."

18, 19, 20, 21. Replying to the defendants' 16th point, which was: "If the jury believes that all the sources of information were within power of plaintiffs' officers, and these officers neglected to attend to their duties (a performance of which would have enabled them to learn that on 1st of February Clark was a defaulter), then they cannot hold the defendants." Answered: "I see no evidence that the officers of the bank neglected to perform their duty in such a manner as would have enabled them on the 1st of February to ascertain that Clark was then a defaulter. Their not having counted the money under Clark's control daily, or not at all, from November 1864 till February 1st 1865, and after, is no such default of theirs as releases the defendants. Had they made an examination on the 1st of February, they might not have discovered any default. They probably would not have discovered it on the 1st of May, if Clark had been able to obtain checks enough to fill his account for that day. But the mere fact that they might have discovered a default February 1st had they searched, is not enough to relieve the defendants."

22. Declining to affirm the defendants' 17th point: "Where security is given for one who is at the time actually a defaulter, and no information of such default is given to the security, it lies on the party taking the security and to be benefited thereby to prove to the satisfaction of the jury, either that he communicated the fact of defalcation to the security, or, if he did not, that it was not within his power by reasonable diligence to learn its existence."

23. Affirming the plaintiffs' 1st point, to wit: "That there is no evidence in the case, of any acts of the plaintiff, prior to, or at the date of the execution of the bond, which would relieve the defendants from liability under the bond."

24. Affirming the plaintiffs' 2d point, to wit: "That there is no evidence of any acts of the plaintiff, subsequent to the discovery of the defalcation, that will relieve the defendants of any liability existing at the date of such discovery."

25. Instructing the jury, that Clark testifies that on that day he issued due-bills to John Anspach, Jr., for something over $60,000, obtaining from Anspach about $30,000, or a little more, in checks, and nothing for the remainder. [If this is so, it was a clear violation of his duty to the bank, a breach of his trust, whereby the bank lost about $30,000. Anspach's debt before (as appearing by his due-bill of March 27th 1865), was $201,000, and he obtained $30,000 more by this operation, without giving any vouchers

[Wayne v. Commercial National Bank.]

or securities for the increase, so far as it appears. Thus, on that day Clark became an additional defaulter to the extent of about $30,000. This defalcation was after the bond on which this suit is brought was given; and if you believe from the evidence given that it occurred in the manner stated, and that the duties of Clark, as paying teller, were such as have been sworn to, it was such a breach of the condition of the bond as entitles the plaintiffs to recover against the defendants.]"

26. Instructing the jury that, if they believed that on 1st May, Clark issued due-bills to Anspach for about $30,000, for which nothing was received, it was such a breach of the bond as entitled the plaintiff to recover.

*Guillou, Juvenal* and *Pancoast,* for plaintiffs in error, submitted three propositions:—1. Was there any liability under the bond, or was the defendant exonerated by reason of previous acts and omissions of plaintiff below?

This proposition embraced the 5th, 6th, 7th, 16th, 17th, 18th, 19th, 20th, 21st, 22d and 23d assignments of error.

They cited Pidcock *v.* Bishop, 3 B. & C. 605; Jackson *v.* Duchaire, 3 Term Rep. 551; Neville *et al. v.* Wilkinson, 1 Bro. Ch. Ca. 473; Eastabrook *v.* Scott, 3 Ves. 456; Raillon *v.* Matthews *et al.,* 10 Clark & Findley 934; Pearson *v.* Morgan, 2 Bro. 388; McFerra *v.* Taylor, 3 Cranch 270; Roosevelt *v.* Fulton, 2 Cowen 133; Lewis *v.* McClernan, 10 Yerger 206; Burrows *v.* Lock, 10 Ves. 475; De Mandeville *v.* Couston, 1 V. & B. 355; 1 Story's Eq., § 193; 1 Madd. Ch. 2, 8; 1 Bro. Ch. C. 546; Woods *v.* Farmere, 7 Watts 385; Nelson *v.* Allen, 1 Yerg. 360; Graves *v.* Graves, 1 A. K. Marshall 165; Moore's Ex'rs. *v.* Blakewell, 6 B. Monroe 67; Moore *v.* Bennett, 2 Ch. Ca. 246; Bisco *v.* Banbury, 1 Id. 287; Domat Civil L. lib. 2, § 4, art. 1; Story on Agency, §§ 308, 452; Angell & Ames on Corporations, §§ 310, 315; Ellis *v.* Turner, 8 T. R. 531; Stevens *et al. v.* Boston Railroad, 1 Gray 177; Railroad Co. *v.* Hughes, 1 Jones 141; Huyett *v.* Philadelphia and Reading Railroad, 11 Harris 373; Barber *v.* Britton & Hall, 26 Verm. 112; Farmers' and Mechanics' Bank *v.* Wyman *et al.,* 5 Gill 336; Albert *v.* Savings Bank, 1 Md. Ch. Dec. 407; Bargate *et al. v.* Shortridge, 5 H. L. 297; Montague *v.* Tiscombe, 2 Verm. 518.

2. If such acts did not exonerate the defendant, was the condition of the bond broken by the issuing of due-bills, and was such breach assigned?

This proposition embraces the 1st, 2d, 3d, 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, 25th and 26th assignments of error.

They cited Act of Congress of June 30th 1864, §§ 156, 158, 162, 170; Hunt *v.* Stevens, 3 Taunt. 113; Furbank *v.* Bell, 1 B. & A. 36; Sturdy *v.* Henderson, 4 Id. 592; Wood *v.* Norton,

[Wayne *v.* Commercial National Bank.]

9 B. & C. 885; National Bank Act, June 3d 1864, 2 Bright. U. S. Dig. 51.

3. If it was so broken then, did the discontinuance of the bank's suit against Anspach relieve the sureties?

This embraces the 4th and 24th assignments of error.

They cited Berks *v.* Ross, 3 Binn. 520, 33, 157; Commonwealth *v.* Wolbert, 6 Id. 292, 300; Cope *v.* Smith, 8 S. & R. 112; Clippinger *v.* Creps, 2 Watts 48; Schuylkill Bank *v.* Macalester, 6 W. & S. 149; Com. *v.* Miller, 8 S. & R. 452; Talmadge *v.* Burlingame, 9 Barr 21; Lichtenthaler *v.* Thompson, 13 S. & R. 157; Pott *v.* Nathans, 1 W. & S. 158; Bank *v.* Bank, 7 Id. 343; Neff's Appeal, 9 W. & S. 36; Cathcart's Appeal, 1 Harris 420; Morrison *v.* Hartman, 2 Id. 56; Miller *v.* Stem, 2 Jones 385; Covely *v.* Fox, 1 Id. 171; Strickler *v.* Burkholder, 11 Wright 476; Wetzel *v.* Sponsler, 6 Harris 460; Kirkpatrick *v.* White, 5 Casey 176.

*R. H. McGrath, F. B. Gowen* and *S. Hood*, for defendants in error.—The liability of the principal of the bond being fixed, that of the sureties is measured by it: Patterson's Appeal, 12 Wright 345; Boehmer *v.* Schuylkill County, 10 Id. 452; Wylie *et al. v.* Gallagher, Id. 205; Moore *v.* Allegheny City, 6 Harris 55; Boreland *v.* Washington County, 8 Harris 150.

The neglect of one agent cannot deprive a corporation of its remedy for the default of another: Amherst Bank *v.* Root *et al.,* 2 Metc. (Mass.) R. 541; Angell & Ames on Corporations 317; Bank of Washington *v.* Barrington, 2 Penna. R. 27; Angell & Ames on Corporations 315.

The liability of a principal for the acts of his agent does not apply to a surety: Union Bank *v.* Clossey, 10 Johns. R. 271. The bank was liable for the fraudulent due-bills issued by Clark: Story on Agency, § 452; Bank of Kentucky *v.* Schuylkill Bank, 1 Pars. R. 216. The due-bills could be stamped at any time within twelve months: Act of Congress March 3d 1865, §§ 1, 2; Bright. U. S. Dig. 264, pl. 252. The creditor has a right to demand his money immediately against the surety, as well as against the principal debtor; and a court of equity will not interfere to deprive him of his right, unless such proceeding would be unconscientious: Theobald's Principal and Surety, pp. 88, 188, §§ 166, 272; Geddis *v.* Hawk, 1 Watts 280; Cope *v.* Smith and another, &c., 8 S. & R. 110; Erie Bank *v.* Gibson *et al.,* 1 Watts 146; Gardner *v.* Ferree, 15 S. & R. 30; Richards *v.* The Commonwealth, 4 Wright 147; Marberger *et al. v.* Pott, 4 Harris 4; Smeidre *v.* Llewellyn, 3 Phila. Rep. 70; Theobald on Principal and Surety, pp. 86, 189, §§ 164, 274; Brubaker *v.* Okeson, 12 Casey 519; Commonwealth *v.* Wenrick, 8 Watts 159.

As to the pleadings, see Rees *v.* Tichenor, 1 Miles 185.

[Wayne v. Commercial National Bank.]

The opinion of the court was delivered, October 17th 1866, by

THOMPSON, J.—The numerous assignments of error in this case are so classified by the counsel for the plaintiffs in error as to present three propositions:

1. Was there any liability upon the bond of the defendant, or was the defendant exonerated by reason of the previous acts and omissions of the plaintiffs below ?

2. If such acts did not exonerate the defendant, was the condition of the bond broken by issuing the due-bills, and was such breach assigned ?

3. If it was so broken, then did the discontinuance of the bank suit against Anspach release the sureties ?

My brother Strong ruled against the defendant's views of these propositions which are contained in the offers of testimony and in the points, and hence this writ of error.

1. The first part of the first proposition needs but little notice. The bond being in legal form, and duly executed by the defendant, was, of course, obligatory on him, and he is liable upon it, if there was a breach of its conditions by his principal, unless he is " exonerated by reason of the previous acts or omissions of the plaintiffs below," which is the last branch of the proposition, and entitled now to notice.

We agree that a fraudulent concealment by the bank of the fact that Clark, their teller, was a defaulter at the time the defendant became his security, and was accepted by the bank, would have been a ground of relief in favour of the latter. Fraud vitiates and avoids all contracts. But there was no proof nor offer to prove this against the bank or its officers.

The ground of complaint was not this, but negligence on part of the officers of the bank in not knowing the true state of the teller's accounts with the bank at the time of his appointment, or rather when the security was given by him. It is not alleged that they had actual knowledge on the subject, but that they had the means of knowing how the matter stood, and are therefore to be visited with a sort of constructive notice of his defalcations. This position, however, does not well consort with the point assumed, namely, that the bank officers were bound to communicate their knowledge to the surety that he had been and was a defaulter before accepting his situation. This they could not do, unless they had actual notice themselves, and it was not proposed to prove that they had such notice, but only to raise a presumption that they might have had notice if they had more diligently scrutinized his accounts. They had no actual notice till months after. I know of no positive duty resting on the officers of the bank to investigate with a view to inform a surety in the absence of any inquiry or request by him to do so. Had such a request been made, and it had been denied or evaded, a different question

[Wayne *v.* Commercial National Bank.]

might have been presented; but it was not. How stands the matter? Simply thus. Neither the bank nor its officers knew or had reason to suspect, so far as we can learn, the defalcation afterwards discovered. Unless, therefore, some rule of diligence be applied to such a case, creating a positive duty on the part of the bank to investigate the accounts of their officers as often as they may be about to give security for future fidelity, for the purpose of disclosing their *status* unasked to their proposed sureties, unsuspecting confidence or ordinary negligence will certainly not be sufficient to visit a bank with a loss of its security. The cases on the subject of the duty of the obligee towards bail have been cited. The first is Railton *v.* Matthews, 10 Clark & Finn. 934. This was a Scotch case, tried before the Lord Justice Clerk of the Court of Session, and removed on appeal from the adjudication of the Second Division of that court to the House of Lords. The question there was whether the defenders were to be affected with the non-communication of facts material to be known by the bail within their knowledge, if they did not *conceal* them with a view to their own personal advantage. The negative of this was the rule administered in the court below, but was reversed in the House of Lords: Lords Cottenham and Campbell delivering opinions. The doctrine of their opinions is well stated in the *syllabus* of the report thus; "The mere non-communication of circumstances affecting the situation of the parties material for the surety to be acquainted with, and *within the knowledge* of the person obtaining a surety-bond, is *undue concealment*, though not wilful or intentional, or with a view to any advantage to himself." Amongst the facts material for the surety to be informed of, says Lord Campbell, were the facts "that he (the agent) was in arrear and had been guilty of fraudulent conduct, and that he was a defaulter." The case turned on the withholding of these material facts, *known* to the *defenders*, from the surety. We are asked to go further, and say that the bank takes the risk of such facts, whether they be known or not. No case goes so far of which we have any knowledge.

The other case cited is Smith *et. al. v.* The Governor and Company of the Bank of Scotland, also determined in the House of Lords: 1 Dow. 272. In that case Lord Eldon said, "If an agent has been guilty of embezzlement or other improper conduct *unknown* to his employer, the cautioner (the surety) would be liable. But if a man found that his agent had betrayed his trust, that he owed him a sum of money, or that it was likely he was in his debt, if under such circumstances he required sureties for his fidelity, *holding him out* as a trustworthy person, knowing or having ground to believe that he was not so; then it was agreeable to the doctrines in equity in England, that no one should be permitted to take advantage of such conduct, even with a view to

[Wayne *v.* Commercial National Bank.]

security against future transactions of the agent. Lord Redesdale delivered an opinion substantially agreeing with that of the Lord Chancellor. The case turns on the question of the non-communication of facts known by the holder of the surety, and material to be brought to his knowledge before binding himself. When a defalcation is unknown to such holder, although it may exist the surety will be liable. This is explicitly decided.

In the case in hand the question arises on the rejection of testimony, which the defendants below contended would have shown negligence on the part of the bank officers in not scrutinizing the liability of the teller and the state of his accounts, and they insist on an inference that diligence in that particular would have resulted in discovering the default.

Perhaps it might, but it might not. Let that be as it may, the testimony offered did not tend to show any reason to suspect that all was not right with the teller, or any reason for a special investigation of his accounts. Had there been a request for such an examination by the proposed surety, and it had been refused or evaded by the officers, there would have been plausibility in the claim of the surety, that their negligence or wilfulness should avail to relieve him. But having no ground to suspect him, and there being no request to investigate his accounts, we see not why the bank should be deprived of its security, by the facts turning out differently from what it had any reason to suppose they would turn out. We think there was no error in the ruling on this point.

As to the quarterly return offered in evidence, it neither established negligence in the officers in making it, nor that the surety was misled by it or ever saw it. It was rightly rejected.

We discover nothing, therefore, to establish the invalidity of the bond at the time it was executed. Is there a valid defence by reason of what occurred afterwards? It is claimed that the due-bills signed by the teller, and through which the fraud was perpetrated, were illegal issues by the bank and void, because of the form of the instrument, and because they were not legally stamped.

The power of the bank to issue due-bills in the form of these before us need not be discussed. The fraudulent teller, who had authority from the bank to issue them for a special purpose, and who abused his trust and issued them for the purpose of raising money for himself, has no right to set up the want of power in the bank to issue them for a special legal purpose. There is a custom among the banks connected with the clearing-house that seems to justify their issue, and I see nothing in the law that forbids it. Be this as it may, neither the teller nor his surety have the right to set up the defence that the bank was not bound to pay them. When the default of the principal would forfeit the bond as to

him, it would have the same effect as to his surety. This is settled in numerous cases: 12 Wright 345; 10 Id. 452; 8 Harris 150; 6 Id. 55. They were not as parties to the instruments entitled to contest them, although they were issued for the bank in the name of the teller. As well might the teller contend, that as he committed a fraud the bank was not bound by his act. This he could not be heard to do: Bank of Kentucky *v.* The Schuylkill Bank, 1 Pars. Ch. 216.

As to the objection that the due-bills were not stamped when issued, the same reasoning applies. The defendant had no concern with that, and the bank did not choose to set that up if it could have done so. But all contest was ended on this point, by having the bills duly stamped at the trial. The law authorized this, and it was therefore not an alteration of the original papers so as to destroy them. If there had been error in their admission as evidence in the first place without stamps, which we do not say was the case, stamping them cured the defect; there is, therefore, nothing in this objection. No argument was presented in support of the allegation that the breach of the teller's bond was not assigned. We think it was well enough assigned, and especially would we hold it so after trial on the merits and verdict.

3. The third proposition is, that the discontinuance of the suit against Anspach was a release of the surety. Why should it be? There was not the slightest effort to show that the surety was damnified by it; that any property in the power of plaintiff belonging to Anspach escaped by the discontinuance of the suit; that everything had not been obtained that could have been obtained by further pursuit of him. Where then was there injury done? It was quite essential that this should appear to give point to the objection, but it does not. We need not discuss the point further, or trouble ourselves with the question, whether the surety could hold the bank bound legally or equitably to pursue Anspach at all before calling on him. After carefully looking at the exceptions and arguments presented, we do not discover anything in this record to correct.

                                    The judgment is affirmed.