JAMES P. SHERMAN, Receiver of the Equitable Mutual Life Ass'n of Waterloo, Iowa, v. GEORGE W. HARBIN; H. B. ALLEN, and W. L. ILLINGWORTH, Appellants.

**Mutual insurance:** DIVERSION OF FUNDS: RECOVERY BY RECEIVER. The receiver of a mutual benefit association cannot recover for the benefit of the association, on an officer's bond, for the wrongful payment by him to one ·member of funds collected for the benefit of another, where the injured member has been made whole from funds subsequently collected, or where the misappropriation did not occur during the life of the bond.

**Assessments:** MISAPPLICATION OF FUNDS. Under the statute, articles of incorporation, by-laws and notices of assessment, it is held, that the officers of a mutual benefit association had no right to use the funds derived from an assessment levied to pay particular losses, or a specified portion thereof, in the payment of other liabilities or losses, where there was not sufficient money derived from the assessment and in the hands of the association to pay all losses in full.

**Evidence:** OVERPAYMENT OF LOSSES. Evidence of overpayment of losses under certain policies of assessment insurance is considered and held insufficient.

**Insurance:** LIMITATION OF LIABILITY. Where the contract of an assessment insurance company provided for payment of a fixed sum in case of death, a provision that in case the amount equitably due from the mortality fund was insufficient, the association might draw from its reserve fund or make a *pro rata* assessment of members to meet the deficiency, did not limit its liability.

**Distribution of assessments:** LIABILITY OF OFFICERS. Where, during the life of his official bond, the president of an assessment insurance company made excessive payments to certain beneficiaries, to the exclusion of others entitled to participate in the particular fund, he was liable on his bond at the suit of the receiver of the association, for such sum as was due the unpaid beneficiaries from such fund.

**Diversion of funds:** LIABILITY OF OFFICERS. The president of an assessment insurance company is not liable on his official bond, for

the individual act of the cashier, in depositing money to the credit of a fund to which it did not belong.

*Appeal from Blackhawk District Court.*— HON. A. S. BLAIR, Judge.

WEDNESDAY, JULY 13, 1904.

ACTION on bonds executed by George W. Harbin, as president of the Equitable Mutual Life Association. Trial without jury resulted in a judgment for the plaintiff. The defendants appeal.— *Affirmed* on condition.

*Boies & Boies, M. J. Wade,* and *W. L. Eaton,* for appellants.

*Edwards & Longley* and *Courtright & Arbuckle,* for appellee.

LADD, J.— The Equitable Mutual Life Association of Waterloo, Iowa, was organized in conformity with the provisions of chapter 65 of the Acts of the Twenty-First General Assembly, now incorporated in the Code as chapters 7 and 8 of title 9. Under section 4 of that chapter (now section 1787 of the Code) the president, George W. Harbin, executed a bond with a penalty of $5,000, March 4, 1896, covering the year following, and another on March 2, 1897, covering a like period, with H. B. Allen and W. L. Illingworth as sureties. The condition fixed by the statute was for the faithful performance of his duties. That of each bond reads: " Now, if the said Geo. W. Harbin as president shall render a true account of his office and of his doings therein to the proper authority when required thereby or by law, and shall promptly pay over to the person or officer entitled thereto all money which may come into his hands by virtue of his office, and shall promptly account for all balances of money which may come into his hands by virtue of his office, and shall promptly account for all balances of money remaining in his hands at

the termination of his office, and shall exercise all reasonable diligence and care in the preservation and lawful disposal of all money, books, papers and securities, and other property appertaining to his said office, and deliver them to his successor, or to any person authorized to receive the same, and if he shall faithfully and impartially, without fear, favor, fraud or oppression, discharge all other duties now or hereafter required of his office by law, then this bond to be void, otherwise in full force." The duties of the officers were prescribed in the by-laws. Those of the president were to preside at all meetings of the association and board of directors, to sign all certificates of membership and all orders on the treasurer, and " to have general management of the business of the association, subject to the control of the board of directors." In the third and fourth counts of the petition the plaintiff, as receiver of the association, alleged that Harbin, in violation of the condition of his bond, negligently and wrongfully permitted " the payment out of the beneficiary fund of said association certain sums of money to persons not entitled thereto under the said articles of incorporation and the contract of insurance held by such persons, issued by said association, and which said sums of money properly and lawfully belonged to the beneficiaries of other deceased members of said association; * * * and by such wrongful and unlawful diversion of such funds from their proper channel other members of said association and the beneficiaries of policies held by other deceased members of said association have been thereby wrongfully and unlawfully deprived of their just portion of said beneficiary fund in the sums and amounts hereinbefore set out." The amount of these overpayments are alleged to have been $19,641.97 during the period of the first bond and $21,960.97 during the period of the second. The district court awarded judgment for the total amount of these bonds, with interest. The defenses interposed were, (1) that there were no overpayments; (2) that, if any there were, they were warranted by the failure to

make full assessments; and (3) that, in any event, the receiver is not in a situation to complain.

I. The liability on each bond must, of necessity, have become fixed at the termination of the period covered by it; and not only a breach during that time must be shown, but damages resulting therefrom. The bonds run **1. DIVERSION OF FUNDS: recovery by receiver.** to the association, but under the law of this State any one for whose benefit they were executed may maintain an action for their breach. Such an association acts as trustee in the collection of funds and their distribution to the beneficiaries entitled to receive them. It was the duty of this association to pay the money collected to meet a particular loss to the beneficiary entitled thereto, and if, for any reason, this was wrongfully diverted to another purpose, the right of the association to follow the fund in order to recover it or to demand its return from the party wrongfully diverting it and discharge its obligation by turning it over to the beneficiary ought not to be questioned. The receiver, in winding up the affairs of the association, may do so in its stead. But neither can recover any more than the damages actually suffered from the misappropriation of the funds. No claim is made that Harbin converted a cent of this to his own use. The wrong imputed to him is the overpayment of certain beneficiaries; that is, the payment to them of more than their equitable portion of the assessment made. Conceding this, who can be said to have been damaged? Certainly no one save other beneficiaries to whom the moneys so diverted of right belonged. The interest of the association ended with the collection and proper distribution of the assessments. If, notwithstanding the fact the president wrongfully paid to one beneficiary funds belonging to another, and the latter has been subsequently paid in full, the injury flowing from the wrongful act has been atoned. It is of no concern to this receiver how this happened. The money belonged to beneficiaries for whom it was collected. Should the receiver succeed, the fund must

be paid over to them, and not into the general assets of the association, to be distributed to those who suffered no wrong during the period of these bonds. It may be that the president of the association paid these losses from the funds collected from others during a later period. If so, he may be liable to beneficiaries, for whose benefit the money so appropriated was collected. Such misappropriation did not occur during the life of the bonds in suit, and the receiver must necessarily look to bonds subsequently executed for restitution.

II. But there is a difference between the obligation of the association to a policy holder and its duty in the matter of distribution of the assessments and dues collected. With 2. ASSESSMENTS: the president's payment of what the policy misapplication of funds. holder might legally exact the association as such could make no complaint, for in that event he merely paid out what it owed. But the statute provides that "the articles and by-laws of each such association and its notices of assessments shall state the objects to which the money to be collected is to be devoted, and no part of the proceeds thereof shall be applied to any other purpose than as stated and the excess, if any, beyond payment of the benefit, shall be set aside and applied only to like purposes." Section 1788, Code. If, then, moneys were collected to be applied upon any particular loss, or any beneficiary was entitled to the money, or any specific portion thereof, raised by assessment or stipulated payment, neither the president nor the board of directors had the right to divert the same to some other purpose. One of the controverted questions is whether losses might be paid from the mortuary fund generally, or should be met by the assessments made for special losses and an equitable portion of the stated payments. To settle the dispute it will be necessary to resort to the articles of incorporation, the by-laws, the conditions of the policy issued, and notices of assessments, and to consider all these in connection with the amounts produced in the several modes of raising

money to satisfy death claims. There can be no doubt but that the original purpose was to provide for losses from specific assessments. This clearly appears from section 2 of the fourth article of incorporation: "The life department may.issue certificates of membership for such an amount as the board of directors may determine, conditioned upon the sum insured being realized by assessment, or annual, semiannual, or quarterly payments, and certificates may be issued for a term of years or for the life of the member." But this was subsequently amended by striking all after the word "determine" and inserting instead, "Upon the advance payment or assessment plan." This amendment, however, merely eliminated the particulars, and does not necessarily involve any change in the manner of doing business. Before and after its adoption one class of certificates requires stipulated premiums at stated intervals, while another exacted the payment of an assessment for each death. Evidently the amendment has reference to these different plans of raising the money to meet losses. Other sections point out the care to be taken of the moneys received and the method of keeping the accounts: "The net proceeds of the mortality part of assessments and stated payments upon members holding life or end of probable life certificates shall be placed in the several funds as follows: Fifty per cent. in the current mortality fund; twenty per cent. in the contingent mortality fund, and the remainder into the reserve mortality fund. * * * The net proceeds of assessments and a due proportion of the mortuary part of stated payments paid by members holding term certificates shall be used for the payment of the beneficiary of the deceased member in due proportion to the proper amount from the mortality fund of the all life class, if a valid claim. * * * The net stated payments to the mortality fund by life or end of probable life members shall be distributed into the several funds as named in the preceding paragraph: * * * The proportion of a death claim due from members by the all life plan shall be

paid from the current mortality fund, but if not sufficient to meet such fund's share of the liability, the remainder shall be taken from the contingent mortality fund, and if liability of the fund still exists, from the reserve mortality fund. The proportion from the mortality fund aforesaid shall be the same sum per capita as is required of members holding ten-year term certificates of equal age and amount." If more was collected than sufficient to pay the losses, the remainder was to be left in the contingent or reserve funds.

In the exigencies of actual experience, however, it was found that nothing ever remained, and in keeping the books the officers ignored the divisions of the moneys as above indicated, and treated all contributed for these purposes as a part of the beneficiary fund. These sections indicate very plainly, however, that the net proceeds of an assessment and the equitable portion of stipulated premiums collected were intended to be paid the beneficiary. This is confirmed by the seventeenth by-law: "At the death of a member the beneficiary shall be entitled to receive the sum insured from an equitable proportion of the net proceeds of assessment upon all members liable therefor, at the schedule rates named in the by-laws for the payment of a claim of said amount, and an equitable proportion from the funds named in article 11." The funds mentioned in article 11 are the same as those covered by the sections quoted. It was amended by adding another section to the effect "that all mortuary claims shall be paid from the mortuary fund as promptly as practicable without awaiting the collection of any particular assessment therefor." This necessarily presupposes that something was in the mortuary fund to be paid in advance of an assessment. This was not true during any period of time involved in this investigation. There was never enough on hand to pay the losses for which assessments had been made, to say nothing about paying a loss in advance of an assessment. The sources from which means were procurable for the payment of indemnity were the assessment of members

and the stated premiums. But a single assessment was permissible for one death, and this, with an equitable portion of the stated premiums, was all that could ever be available to meet a loss under the articles or by-laws. When enough was not raised to pay the face of any policy, the officers, in paying some in full, must have known that the net proceeds of an assessment or of the equitable portion of the stated premiums in right belonging to others was being used for that purpose. The evidence is ample that Harbin fully comprehended the situation, and was knowingly robbing Peter to pay Paul, in order to avoid the loss of prestige incident to an admission of the association's inability to pay losses in full, though ever with the hope of so increasing the association's membership that payment of all claims in full would at some time in some way prove possible.

Turning now to the policies, it will be found that many of them stipulated for payment to the beneficiary of the net proceeds of " one assessment on all members," or a percentage thereof clearly indicated; that it was proposed to give such beneficiary the advantage of a specific assessment for his benefit. The different kinds of policies will be referred to hereafter. The assessments were made so as to lead the members to believe that in paying the same they were contributing to the death losses enumerated in the notices. Prior to June 10, 1895, these notices, after naming the assured for whose death assessment was made, added: " The net proceeds of assessments are to be used to pay claims for which issued, the balance to be placed in endowment or reserve fund." This was eliminated at that time, and in all notices thereafter issued these words substituted: " The net proceeds of assessments are to be used to pay death claims, balance to be placed in endowment fund." As already indicated, there was never anything for either the endowment or reserve fund, and no such accounts were kept. A sample of notices sent out may be of interest:

Certificate No. ——                          Assessment No. 63.
                        Office of
              EQUITABLE MUTUAL LIFE ASSOCIATION.
                                    Waterloo, Iowa, Jan. 1st, 1896.
M ——————
    Proofs of death of the following members of the Association have
been received, and, by order of the Board of Directors, an assessment
at schedule rates for each is levied upon all members in good standing at
date of death, payable one-half on or before Feb. 1st, and balance March
1st, 1896.

| Death No. | Name | Age | Cert. No. | Resi- dence | Cause of Death | Date | Am't of Ins· |
|---|---|---|---|---|---|---|---|
| | J. W. Perry | | | | | Sept. 21, 1895 | $1,000 |
| | A. Johnson | | | | | Sept. 27, 1895 | 2,500 |
| | E. A. Stockton | | | | | Oct. 5, 1895 | 1,000 |
| | S. K. Wilson | | | | | Oct. 6, 1895 | 1,250 |
| | J. W. Moody | | | | | Oct. 9, 1895 | 2,500 |
| | H. B. Chambers | | | | | Oct. 10, 1895 | 1,000 |
| | E. J. Connor | | | | | Oct. 20, 1895 | 3,750 |
| | H. Truxes | | | | | Oct. 21, 1895 | 1,250 |
| | Jas. Pott | | | | | Oct. 30, 1895 | 2,500 |
| | Mary Jenkins | | | | | Nov. 3, 1895 | 265 |
| | D. Schmidt | | | | | Nov. 14, 1895 | 2,500 |
| | F. Taylor | | | | | Nov. 24, 1895 | 3,000 |

    The amount of your assessment for the above deaths is $——— .
No Other Deaths Reported at Date of Printing Notice, December 15,.
1895.
    The net proceeds of assessments are to be used first to pay death claims,.
balance to be placed in the endowment and reserve funds.

    For what death claims were these assessments made?
Would anyone suppose any other than these mentioned were
intended? If so, why mention these? Any person of or-
dinary prudence, upon reading this notice, would have con-
cluded that assessments at the rate per member provided in
the articles was demanded to pay the particular losses men-
tioned. At one time the State Auditor appears to have sug
gested that it was the duty of the association to pay losses
promptly, and in full, from its mortuary fund, thereby avoid-
ing the possibility of expense from litigation. Undoubtedly,.
this was on the theory that it had a reserve fund from which
to pay. Such a fund is contemplated by the statute quoted,.
but Harbin well knew at the time that this association had

never succeeded in establishing a reserve fund; a circumstance of which the auditor does not seem to have been informed. Certainly neither the statute nor the suggestion of the auditor contemplated full payment of one loss out of funds to be applied on another when there was not enough to pay both in full. On any construction of several of the policies the beneficiary named in each was entitled to the amount realized from the assessments as made. There was no other fund out of which to pay them, and under the terms of this notice and the plainest principles of justice each was entitled to the amount raised for his benefit. Indeed, article seventeen of the by-laws had never been repealed or modified, and by its express terms each beneficiary was " entitled to receive the sum insured, from an equitable portion of the net proceeds of assessment upon all members liable therefor, and an equitable proportion of the surplus fund from assessment on stated payments." " An assessment at schedule rates for each is levied upon all the members." But it is urged that not all the members were assessed, and, but for irregularity in this respect, enough would have been raised to satisfy all claims in full. Possibly the secretary was derelict in the discharge of his duties in this respect, but if so, this will not excuse the president for improperly distributing the funds collected. That those collected were insufficient to pay was understood by him, and the excessive payments were not made owing to any expectations that other contributions would be received from the members not previously assessed for the losses included in the particular notices.

III. Ten assessments, numbered from sixty-three to seventy-two, inclusive, were made during the periods of these bonds. Excessive payments are claimed to have been made to thirty-five members under the first amounting to $15,343, and to thirty-nine members under the second amounting to $12,716.93. One La Barre had been clerk, and subsequently cashier,

3. EVIDENCE: overpayment of losses.

of the association, and was acting as clerk for the receiver at the time of the trial. After testifying that the amount of the death claims under assessment No. 63 was $22,515, and that the net proceeds was $12,411.89 and the stipulated premium $3,162.25, was asked this question: " Assuming that the persons whose claims are assessed for received a *pro rata* portion of the net proceeds of assessment, as measured by the face of their policies, what amount of money would a $1,000 claim be entitled to, where the death claims for the period were $22,515.15, and the net proceeds of the assessment, together with the stipulated premium money for the same period, amount to .$15,574 ? (Each of the defendants object as incompetent, irrelevant, and immaterial, and grounded upon an assumption which is in conflict with the law; the liability of the association depending upon the terms of the several contracts. Objection overruled. Defendants except.) A. $691.71." Like inquiries were made concerning each of the assessments, and by deducting the average thus found. from the actual payment under each of the policies the plaintiff claims to have proven the several overpayments alleged. This plan was available if all policies read alike, for the liability of a mutual association, like that of any other, necessarily depends on the terms of its contracts. Assessment No. 63 was for the payment of ten death losses. The certificates on which these were payable differed radically. The beneficiary of Perry was to be paid " eighty per cent. of the net proceeds of one assessment upon all members of the brotherhood, not to exceed the sum of the policy," which " shall be payment in full for any death or disability claim, and that the remaining twenty per cent. shall be placed in the reserve fund to the credit of each policy, and on the tenth anniversary of each policy the same shall be payable to the insured." This was a certificate issued by the St. Stephen's Brotherhood, which the association had contracted to perform. The beneficiary was to be paid " the equitable proportion of the next quarterly assess-

ment, or of an assessment specially ordered on all members in good standing at date of assessment who were such at date of death of said member, an equitable proportion of the current mortality fund, not exceeding $2,500." Three others were to be paid " the net proceeds of one assessment upon all members at date of death of said member," not exceeding the amount of the certificate. Two certificates provided " that upon satisfactory proof of death of said person" the association " will pay to Anna D. Truxes" in one, and to Henry Evilson in the other, $1,250. The association promised to pay " to Ella Chambers, wife, within ninety days of acceptance of satisfactory proof of a valid claim under this policy resulting from the death of Henry B. Chambers prior to ten full years from the date hereof, $1,000, deducting therefrom all indebtedness on account of this policy, including the payments to become due hereunder during the remainder of the current policy year." Upon one there was no claim of excessive payment, and the only remaining pledges to the beneficiary the payment, first, of " the equitable proportion of the next quarterly assessment after the filing of said proof upon all members in good standing at date of said quarterly assessment, or of an assessment specifically ordered for the payment of such claim on all members in good standing, and who were such at date of death of said member, not exceeding $1,000.00. Should the sources named not be sufficient to pay the full amount stipulated, it shall be augmented by an equitable share of the contingent mortality fund, and, if yet insufficient to pay the claim in full, an equitable proportion shall be added from the reserve mortality fund, but in no case shall the sum paid exceed the principal sum named." It will thus be seen that the first was to be paid eighty per cent. of the assessment, three were to receive an equitable proportion of an assessment and of the current mortality fund, another the same with promise of aid from the reserve mortality fund, three the net proceeds of an assessment, and three were promised full payment. It

may be that, as there appears to have been no reserve fund, conditions relating to that cannot be treated as differentiating these certificates. But certainly the promise to pay eighty per cent. of an assessment cannot be treated synonymous with the equitable proportion or the net proceeds thereof. Nor can any of these be regarded as imposing the same obligation on the association as to the contract to pay a specified amount. The right of such an association to stipulate for the payment of a fixed sum is recognized by our statutes, and the association's by-laws provided for the issuance of " any form of insurance approved and adopted by a majority of the board of directors."

But appellee contends that what was known as " safety clause " was included in each of these certificates, and that it limited the indemnity to the amount which should be col-

**4. INSURANCE:** lected from the members of the association.
**limitation of**
**liability.** This does not in any way obviate the express promise of the association to pay the amount of the insurance. All that is indicated are the sources from which the necessary funds are to be derived. After describing the policy, it proceeds: " This safety clause is to comply with the laws of some States which have as yet made no provision for a strictly ten-year surrender value feature, and in order to cover any possible contingency whereby the share equitably due from the mortality fund of this and other forms of policies should be insufficient to pay the death claim hereof in full, all the parties to this contract covenant and agree that the board of directors may in their discretion draw from the surplus and reserve to the credit of this and all other forms of policies, an equitable proportion to meet said deficiency, or they may call upon each member of the association for an equitable *pro rata* share of said deficiency. Said call, if made, shall be due and payable thirty days from date of notice." There is not an intimation in it of a purpose to do otherwise than pay the indemnity pledged. Indeed, the intention manifested is to make this doubly sure by pointing

out the sources to be resorted to in certain contingencies. The obligation is not made contingent upon deriving the requisite amount from the funds mentioned, nor is it limited by the assessment. See *Follis v. Ass'n*, 94 Iowa, 435; *Byrnes v. Am. Mut. Fire Ass'n*, 114 Iowa, 738; *Delle v. State Mutual Hail Ins. Co.*, 119 Iowa, 173; *Watt v. Equitable Life Ass'n*, 111 Iowa, 90.

IV. It does not follow, however, that the rulings by which the answers were permitted were erroneous. But one of the ten assessments, with the money derived from the

**5. DISTRIBUTION OF ASSESSMENTS: liability of officers.** stated premium policies, realized to exceed seventy cents on the dollar of the insurance, and the last yielded but forty-three cents on the dollar. As to all these assessments the question was proper, for, in any event, the beneficiary under each policy was entitled to all that was realized from the assessment on the death of the assured. Regardless, then, of the conditions of the policies, the president had no right to take what belonged to one beneficiary and pay it to another, even though the association might be liable for the payment of the claim of the latter in full. One assessment, however, yielded eighty-three cents on the dollar of the face value of the policies, and as to this the question may not have been appropriate. If any of the beneficiaries were entitled to less than this, the surplus might have been lawfully applied in payment to those entitled to the face of their policies, and in this event there might not have been an overpayment. If, however, each beneficiary was entitled to all realized from the assessment, it should have been paid to him. The appellant's contention that the assessments, when collected, became a part of the general assets, subject to the discharge of any legal liability, has been disposed of. As seen, this is not our construction of the articles of incorporation or of the certificates of insurance issued. It may be that in the bookkeeping of the concern the moneys received for assessments of death losses were to be entered in certain mortality funds, but, if so, they were

also to be paid therefrom. But most of the certificates promised the payment of a specific portion of the proceeds of an assessment, and this was levied on members for the express purpose of paying particular death losses designated in the notices sent out to members. It appears that but three beneficiaries for whose benefit assessments were made remained unpaid at the time this action was begun. Whether appropriate proofs of loss were presented does not appear. But it is fair to presume, in the absence of any showing to the contrary, that the association was satisfied with the validity of the claims before ordering an assessment therefor. These claims have been filed with the receiver, one for $1,250 and two for $1,000 each. On the first, according to the evidence, the net proceeds of the assessment actually made, together with its share of stipulated premiums, the association should have paid $850.96, and on one of the others $664.87, and on the last $427.77. For these amounts the district court might properly have rendered judgment.

V. On the plaintiff's appeal it is claimed that Harbin, as president, caused certain interest and rents collected, which properly belonged to the surrender value fund to be placed **6. DIVERSION OF** in the general or expense fund of the associa-**FUNDS: liability of officers.** tion, and to be used in meeting its general expenses, contrary to the statute and articles of incorporation. The interest collected on the surrender value fund, which had been invested in first mortgage securities, amounted to $569.75 during the first period and $216.31 during the second. An office building had been erected, and in January, 1895, by resolution of the board of directors, was set apart as belonging to the surrender value fund in satisfaction of interest and rents previously made use of by the association in defraying its expenses. The rents thereon, over and above taxes paid, amounting to $604.92 collected thereon during the first period and $339.40 during the second, were received by the cashier, and placed in the general or expense fund of the association. The plaintiff contends that these items should

have been preserved as a part of the surrender value fund. Conceding this, it does not follow that Harbin was responsible for their diversion. One of the officers of the association was a cashier. He was required to give bond, and his duty was " to receive all funds of the association, and to deposit the same with the treasurer daily, taking his receipt therefor, to be responsible for the correct keeping of the books of account of the association." According to his testimony, it was his duty " to determine where the funds went." If these items were placed in the wrong fund, it was his fault, and not that of Harbin. The trial court found that the latter knew nothing of the error, and this is supported by the record. While he was charged with the general management of the association, other officers had duties to perform, and unless he was wanting in diligence in the matter of investigating and discovering this error, he ought not to be held derelict in the performance of his duty.

VI. During the period of the first bond there was paid from the beneficiary fund, on orders signed by Harbin, for attorney's fees, for expenses of litigation, and the investigation of claims $519.20, and during period covered by the second bond $1,586.85. Recovery is asked for these amounts on the ground that neither the association nor its officers had the right to use the money from that fund for any purpose other than the payment of indemnities. This may be conceded. But, if so taken, these sums were from moneys belonging to beneficiaries under policies by virtue of which the assessments were made and stipulated premiums paid, and no recovery may be had save for their benefit. As all of such claims but three have been satisfied, and liability for these is adjudged under another division of this opinion, no further attention need be given this matter. The contention that the receiver is estopped from recovering overpayments is disposed of by what is said in *Sherman v. U. S. Fidelity & Guaranty Co.,* (decided at the present term).

It follows that the judgment must be reversed unless

the plaintiff will file a *remittitur* of all in excess of the items for which recovery is authorized within thirty days, in which event judgment may be modified and AFFIRMED.