JAMES P. SHERMAN, Receiver of the Equitable Mutual Life Association of Waterloo, Iowa, v. GEORGE W. HARBIN and THE UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellants.

**Mutual life insurance:** OFFICERS: BREACH OF DUTY. The board of directors and the president of a mutual insurance company are governed by the statutes and its articles of incorporation, and any act of the president in violation thereof is a breach of duty, though directed or acquiesced in by the board.

**Official bonds:** CONSTRUCTION. The provision in an insurance company official's bond that he shall "faithfully discharge all other duties now or hereafter required of him by virtue of his office," not only has reference to matters previously enumerated in the bond but includes any breach of duty.

**Same.** Where an insurance official, on re-election, presents a bond for the ensuing year, the language of which indicates a new obligation, it does not constitute a renewal of a former bond though incorporating the covenants thereof.

**Diversion of funds:** LIABILITY OF OFFICERS. The president of a life insurance company is not responsible on his official bond for the act of a bonded cashier, in placing funds to the credit of the wrong account on the books of the corporation, when done without his knowledge.

**Diversion of funds:** BREACH OF OFFICIAL BOND. Where the articles of a mutual insurance company provide for the creation of a fund to pay the expenses of litigation, a diversion by an official to that purpose, of assessments collected to pay death losses, is a breach of the conditions of his official bond providing for the faithful discharge of duty.

**Surety contracts:** DUTY OF OBLIGEE: FRAUD. The obligee in a surety bond is not required to aid the surety in determining the desirability of the contract of indemnity nor to warn him against risk where all the facts are as accessible to one as the other, whether the surety be present or absent, unless the circumstances of the case are such that silence on the part of the obligee would amount to an intentional deception or fraud. In the instant case, fraud is not shown.

**Unauthorized act of official.** Where it was no part of the duty of the
7  secretary of an insurance association to certify that the books and
accounts of the president had been audited and found correct, the
association was not bound by such certificate furnished by the sec-
retary to a surety company executing the president's official bond.

**Diversion of funds:** NOTICE TO SURETY. A mutual benefit association
8  is not under obligations to notify the surety on the official bond
of its president, of the wrongful act of such officer in misappropri-
ating assessments collected by the association and simply held in
trust by it for the payment of specific beneficiaries, to the payment
of other death losses or the expenses of litigation, where the asso-
ciation did not have actual knowledge of the wrongful act of such
officer.

*Appeal from Blackhawk District Court.*— HON. FRANKLIN
C. PLATT, Judge.

WEDNESDAY, JULY 13, 1904.

ACTION on two bonds executed by Geo. W. Harbin, as
president of the Equitable Mutual Association with the
United States Fidelity & Guaranty Company as surety.
Trial without jury resulted in a judgment as prayed. The
defendants appeal.— *Affirmed.*

*Mullan & Pickett,* for appellants.

*Edwards & Longley* and *Courtright & Arbuckle,* for
appellee.

LADD, J.— George W. Harbin was president of the
Equitable Mutual Life Association of Waterloo, Iowa, from
March 2, 1898, to March 2, 1899. As required by the arti-

1. MUTUAL LIFE   cles of incorporation and section 1787 of the
INSURANCE:
officers;        Code, he executed a bond, with defendant as
breach of
duty.            surety, for the first year, conditioned he should
" render a true account of his office and of his doings therein
to the proper authority when required thereby or by law,
and shall promptly pay over to the persons or officers en-

titled thereto all moneys which may come into his hands at the termination of his office, and shall promptly account for all balances of money remaining in his hands at the termination of his office, and shall exercise all reasonable diligence and care in the preservation and lawful disposal of all money, books, papers and securities, or other property, pertaining to his said office, and deliver them to his successor, or to any person authorized to receive the same; and if he shall faithfully and impartially discharge all other duties now and hereafter required by virtue of his said office then this bond to be void, otherwise in full force." The association was organized in 1881, but reorganized under chapter 65 under the Acts of the Twenty-First General Assembly (now chapters 7 and 8, title 9, of the Code) in 1886. The duties of the president, as defined in article 1 of the by-laws, was " to preside at all meetings of the association and board of directors, sign all certificates of membership or policies of insurance issued by the association, and all orders upon the treasurer, and have general management of the business and conduct of the correspondence of the association subject to the control of the board of directors." Upon the board of directors was conferred " the power to make by-laws for the regulation of the association and the management of its affairs and business, if consistent with the articles of incorporation." While the business of the association was under the management of the board of directors, and the president subject to its control, both were governed by the articles of incorporation and statutes of the State defining and limiting their respective duties and powers. Any act of the president contrary to these, even though directed or acquiesced in by the board, constituted a breach of duty, for the board itself was without authority to override or ignore the laws of the State or the articles of incorporation by the members of the association.

II. It is not pretended that Harbin failed to account

for moneys, if any, which came into his hands as president, and it may be, as contended, that the diligence referred to

**2. OFFICIAL BONDS: construction.** in the bond should be held to relate to valuables confided to him in his capacity as president. But the condition that he "faithfully discharged all other duties now or hereafter required of him by virtue of his office" ought not to be construed as relating only to what precedes. It has reference to matters not previously enumerated, and is broad enough to include all the delinquencies complained of.

III.   At the end of the year covered by the above bond Harbin was re-elected president of the association, and in qualifying presented the following obligation, duly executed

**3. SAME.** by the defendant: "In consideration of the sum of seventeen 50/100 dollars, the United States Fidelity and Guaranty company hereby guarantees the fidelity of George W. Harbin in the sum of five thousand dollars, in favor of Equitable Mutual Life Association, from the 2nd day of March, 1899, to the 2nd day of March, 1900, subject to all the covenants and conditions set forth and expressed in the bond of this Company, No. 7,559 heretofore issued on the 2nd day of March, 1898." Though incorporating the covenants and conditions of the previous bond, this is in no sense a renewal or continuance of it, but, as its language plainly indicates, a new and independent undertaking in compliance with the statute. The bond is not like that considered in *First National Bank v. U. S. Fidelity & Guaranty Co.,* 110 Tenn., 10 (75 S. W. Rep. 1076). There the original bond stipulated for indemnity for delinquencies during its continuance or any renewal thereof, and the word "renewal" was inscribed on the new contract. Here the matter of renewal is not mentioned directly or inferentially in either instrument.

IV.   The association issued a policy covering a period of ten years and the by-laws provided that: "The surplus of assessments on certificates of the ten-year surrender value

plan, after paying full beneficiary claims, the surplus of an-

**4. DIVERSION OF FUNDS: liability of officers.** nual dues paid on said certificates after paying the balance of necessary expense, if any, of the association, which membership fees have not been paid, shall constitute a surrender value fund." At the end of ten years the certificate holder was entitled "to receive within 90 days of maturity his equitable and just portion of the surrender value fund as thus created." The fund had been invested in first mortgages on real estate and in an office building occupied in part by the officers of the association and in part rented to others. During the period of the first bond the net amount of rent and interest, after paying taxes, was $623.35, and during the period of the second bond $380.45. These items were entered as a part of the general or expense fund, and made use of for that purpose, whereas it is said they belonged to the surrender value fund. Without deciding whether the moneys so collected were properly expended, it is enough to say that the president was not responsible for the mistake, if any, made. His statement that he had no knowledge of the error, if it was such, is uncontradicted. As pointed out in *Sherman v. Harbin,* 124 Iowa 643, submitted with this case, the duty of determining to which fund the moneys belonged devolved upon the cashier, and, though Harbin may have occasionally glanced over the books of account, accurately indicating the source of every item and its disposition, it does not appear that his attention was directed to any of these. Auditing the books was no part of his duty, and it cannot be said in not discovering errors overlooked by the auditing committee of the board of directors year after year he was derelict in the performance of his duties as managing officer. See *Batchelor v. Planters' Nat. Bank,* 78 Ky. 435. The fault, if any, was that of the cashier, from whom a bond was exacted in the same amount as that of the president.

V. The evidence tends to show that certain losses were

paid in excess of the portion of assessments and stipulated premiums to which they were entitled, and that such overpayments were taken from the moneys which should have been applied to the satisfaction of other losses. This subject was fully considered in. *Sherman v. Harbin et al., supra,* and the conclusion there reached is controlling. It is difficult to determine from the record before us the extent of the liability on each bond because of these excessive payments to certain beneficiaries from funds justly belonging to others, but enough appears to show that such payments, during the life of each bond, together with the funds diverted for the expenses of litigation, equal the indemnity stipulated in each bond.

VI. During the period of the first bond the sum of $7,013.15 was paid out of the beneficiary fund to meet the expenses of resisting the payment of claims, and $2,658.02 during the period covered by the second. The moneys of this fund, as was held in *Sherman v. Harbin et al.,* had been collected for the payment of specific death losses. The articles provided for the collection of membership fees and $4 per average $1,000 insurance per annum for expenses. Other provision for the expenses incident to the protection of the association against unjust claims might have been provided, as the articles conferred the authority. That this was not done furnished the officers no excuse for taking the moneys collected in to meet death losses for any other purpose. If assessments were made to meet the losses contested, it may be that other beneficiaries could not complain of the expenditure of such amounts. But we do not understand this was done. The stated premiums were collected to pay losses allowed, and not for the purpose of preventing and defeating their allowance. All that was taken from the beneficiary fund and paid as expenses in resisting claims belonged to beneficiaries in whose behalf the assessments and stated premiums had

*5. DIVERSION OF FUNDS: breach of official bond.*

been collected, and in directing that this be done and signing the orders for that purpose the president broke the condition of his bonds for the faithful discharge of his duties. This is the interpretation Harbin must have put on the articles of incorporation, for in December, 1898, he wrote to a member of the association: "There has been no other use made of the assessments paid by policy holders than to pay death claims and for the surrender value fund. Not one dollar of same being used for expense or any other purpose, and therefore you and all other matured policy holders will receive your share of the surplus, together with accumulated interest." And in October, 1897, to another: "No part of the funds for death claims can be used for any purpose than the payment of such claims."

VII. The appellant pleaded that the bonds were invalid because of fraudulent concealment and misrepresentation by the association when they were accepted. Some difficulty has been experienced in determining under 6. SURETY CONTRACTS: duty of obligee; fraud. what circumstances the obligee in a bond is bound to communicate his knowledge of the previous defaults or misconducts of the principal to one who proposes to become surety. The authorities agree that all interrogations by the latter must be candidly and truthfully answered. But what should be exacted in the absence of inquiry? All are agreed that nothing need be done by the obligee unless a fit opportunity is afforded. If the surety is absent, so that no direct communication can be made, the obligee is under no obligation to search out the surety and warn him of the danger of the step he is about to take. In such a case he has the right to assume that all the information desired has been obtained from the principal. *Home Ins. Co. v. Holway,* 55 Iowa, 571; *The Western N. Y. Life Ins. Co. v. Clinton,* 66 N. Y. 326. The same rule necessarily applies, even though the surety be present, when all the facts are as accessible to the surety as to the obligee,

for, as said before, the latter is not bound to aid the surety in determining the propriety of entering into the contract. As remarked in *Wilmington C. A. Ry. Co. v. Ling,* 18 S. C. 116: "The law stands between the parties perfectly impartial, ready to rebuke fraud, concealment, or misrepresentation on the part of either; but carelessness and want of proper vigilance are left to their own fruits. There must be an intent to deceive, not a mere passive omission to state everything within the knowledge of the creditor. The intent is the gist of the fraud, and this should be made to appear." In *Magee v. Manhattan Life Ins. Co.,* 92 U. S. 99 (23 L. Ed. 699), the court said: "A fraudulent concealment is the suppression of something which the party is bound to disclose. To constitute fraud, the intent to deceive must clearly appear. The relation of principal and surety does not require the voluntary disclosure of all the material facts in all cases. * * * To render the general allegation of concealment sufficient in a pleading, it is necessary also to aver that the creditor either procured the surety's signature, or was present when the instrument was executed, and then misrepresented or concealed essential facts which should have been disclosed; otherwise the allegation of fraud is only the pleader's deduction." To the same effect, see *Roper v. Sangamon Lodge,* 91 Ill. 518 (33 Am. Rep. 60); *Ætna Life Ins. Co. v. Mabbett,* 18 Wis. 667; *Atlas Bank v. Brownell,* 9 R. I. 168 (11 Am. Rep. 231). The English cases do not appear to be entirely consistent, but the later ones are in harmony with the rule as last above stated. See *Railton v. Mathews,* 10 Cl. & F. 934; *Hamilton v. Watson,* 12 Cl. & F. 109; *North Brit. Ins. Co. v. Lloyd,* 10 Exch. 523. See also, *Home Ins. Co. v. Holway,* 55 Iowa, 571, and cases cited; *Lake v. Thomas,* 84 Md. 608 (36 Atl. Rep. 437); *Palatine Ins. Co. v. Crittenden,* 18 Mont. 413 (45 Pac. Rep. 555), and cited cases; *Lachman*

*v. Block,* 47 La. Ann. 505 (17 South. Rep. 153, 28 L. R. A. 255); Brandt on Suretyship,. section 419.

But the circumstances may be such that the obligee is bound to disclose facts within his knowledge which increase the hazard of the risk, even though no inquiry has been made. Thus, in *Maltby's Case,* 1 Dow. Parl. Cases, 294, a party knowing himself to have been cheated by a clerk concealed the fact, and applied for security in such a manner and under such circumstances as to hold out the clerk as one whom he considered a trustworthy person, and thereby induced another to become his surety. Silence, under such circumstances, being treated as expressive of confidence, was held to invalidate the contract. See *Franklin Bank v. Stevens,* 39 Me. 532. In *Etting v. Bank,* 11 Wheat. 59 (6 L. Ed. 419), the Supreme Court of the United States was equally divided as to whether the omission to make known to the surety the fact that the principal, a cashier, had previously misappropriated money of the bank, would release the surety, and the decision of the Circuit Court was affirmed. In that case the suretyship was of the cashier's note to the bank, and the question was whether the bank was bound to make known the character of the indebtedness. In *Franklin Bank v. Cooper,* 36 Me. 179, 196, the question was considered at length, and the conclusion reached that

It is generally admitted that an omission to communicate circumstances materially affecting the risk known to one party and unknown to the other will destroy the validity of the contract whenever the party having the knowledge is bound to communicate it. The difficulty consists in arriving at a correct conclusion under what circumstances one is so bound. He is bound when the relations are such that the other party is entitled to repose any particular confidence in him, and when inquiries are made respecting the suretyship. Is he equally bound when he has suitable opportunity to make them known? * ,* * One who becomes a surety for another must ordinarily be presumed to do so upon the belief

that the transaction between the principal parties is one occurring in the usual course of business of that description subjecting him only to the ordinary risks attending it; and the party to whom he becomes a surety must be presumed to know that such will be his understanding, and that he will act upon it, unless he is informed that there are some extraordinary circumstances affecting the risk. To receive a surety known to be acting upon the belief that there are no unusual circumstances by which the risk will be materially increased, well knowing that there are such circumstances, and having a suitable opportunity to make them known, and withholding them, must be regarded as a legal fraud by which the surety will be relieved from his contract.

See, also *Dinsmore v. Tibdall,* 34 Ohio St. 411; *Bellevue B. & L. Ass'n v. Jeckel,* 20 Ky. 460 (46 S. W. Rep. 482); *Third Nat. Bank v. Owen,* 101 Mo. Sup. 558 (14 S. W. Rep. 632).

We have not found any case deciding that in no event is the obligee obliged to disclose his knowledge of the past conduct of the principal in absence of inquiry, nor, on the other hand, is there any decision saying that such information must always be given if opportunity is afforded. Statements of this character have been incorporated in some text-books, however. What is exacted necessarily depends on the circumstances of each particular case, but certainly the information which must be imparted should relate to the subject-matter of the suretyship. As certainly the situation must be such that the obligee, as a matter of fairness, ought to state what he knows, and the omission to do so may be attributed to an intention to withhold information in aid of some advantage to himself. In other words, there must be an intent in some way to mislead, either by silence or what is said, for without an improper motive there can be no fraud such as to invalidate the contract. If the bond is tendered by or received from the surety under conditions indicating that the obligee must have known the surety was acting without knowledge of past misconduct increasing the

risk about to be assumed, and which might have deterred him from executing the bond, and, so knowing, the obligee takes the bond without disclosing the facts constituting such misconduct, though having the opportunity to do so, he may well be found guilty of fraudulent concealment. But he is not bound to assume ignorance on the part of the surety, nor to advise him, unless he has reason to suppose the surety is acting in ignorance of facts within his knowledge increasing the hazard of what he is about to do, for the burden of guarding the latter's interest is in no way cast upon the obligee. The difference in the authorities is not in the principles to be applied, but with respect to the proof which is essential. See Brandt on Sur. & Guar., section 365 et seq. In the instant case there is nothing to show the association was called upon for information concerning Harbin's past conduct, or was afforded the opportunity to disclose what it might have known prior to the execution of either bond. Apparently, these were filed in pursuance of the requirement of law and the articles of incorporation, and accepted without other communication between the parties. It is needless to add under such circumstances the association cannot be held guilty of fraudulent concealment.

Before the execution of the contract beginning March 2, 1899, Harbin prepared and the secretary signed the following statement addressed to the defendant company:

7. UNAUTHORIZED ACT OF OFFICIAL. This is to certify, that on the 7th day of March, 1899, the books and accounts of Mr. Geo. W. Harbin in the employ of the Equitable Mutual Life Association as president, were reported upon by the auditing committee of said association, duly appointed by the board of directors, said report being the result of a full examination of said report and comparison of it with the books and accounts of the association and all moneys of the association handled by him duly accounted for. He has performed his duties in an acceptable and satisfactory manner and no reason is known why the guarantee bond should

not be continued.   His salary is now two hundred and forty dollars ($240.00) per month and he has been duly elected president of the association for the ensuing year.

The bond does not purport to be based on this statement, nor is it made a part thereof.   What the secretary did was without the authority of the board of directors or its executive committee, and was no part of his duty as such officer.   He merely acted for the accommodation of Harbin, with whom he had joined in the improper use of these funds.   As what he did was not within the scope of his agency, the association was not chargeable with notice thereof or bound thereby.   As fully supporting these views, see *Amer. Surety Co. v. Pauley,* 170 U. S. 133 (18 Sup. Ct. 552, 42 L. Ed. 977) ; *Perpetual Building & Loan Ass'n v. The U. S. Fidelity & Guarantee Co.,* 118 Iowa, 729.

VIII.   As contended by appellant, the obligee is bound to treat the surety in entire good faith, and ordinarily, upon discovering the employe's delinquencies, must notify the

8. FRAUD: diversion of funds; notice to surety.

surety.   See Brandt on Suretyship and Guaranty, page 368.   But this rule has no application to cases of mere breach of duty or contract obligations on the part of the employe not involving dishonesty or fraud on his part, or fraud or concealment on the part of the employers.   *Lancashire Ins. Co. v. Callanan,* 68 Minn. 277 (71 N. W. Rep. 261) ; *Atlantic & Pac. Tel. Co. v. Barnes,* 64 N. Y. 385 (21 Am. Rep. 621.   What Harbin did by way of diverting money raised to pay specific losses to the payment of others or for the expenses of litigation was dishonest, and a fraud against the beneficiaries entitled to the money taken.   But it was not an appropriation of money belonging to the association.   It held such moneys in trust for the beneficiaries.   *Palmer v. Northern Mut. Relief Ass'n,* 175 Mass. 396 (56 N. E. Rep. 828).

Had the money belonged to the association, then probably it must have advised the surety upon discovering Har-

bin's delinquencies; but even then it must have had actual knowledge thereof. Constructive notice will not suffice. On this point there seems to be no variance in the authorities. Those cited by appellant relate to the responsibility of a principal for acts of an agent, and are not relevant. Even though the obligee, by the exercise of ordinary care, or but for neglect in the performance of some official duty, might have known, it cannot be held guilty of such concealment as will relieve the surety. Failure to communicate what a person does not know cannot amount to a fraud unless he is under an obligation to investigate. The obligee owes the surety no such duty. *State v. Atherton,* 40 Mo. 209; *Batchelor v. Planters' Nat. Bank,* 78 Ky. 435; *Inhabitants of Farmington v. Stanley,* 60 Me. 472; *Tapley v. Martin,* 116 Mass. 275; *Bowne v. Mount Holly Nat. Bank,* 45 N. J. Law, 360; *Wayne v. Com. Nat. Bank,* 52 Pa. 343. So that mere want of diligence on the part of any of the directors or auditing committee will not relieve the defendant company. The association did not contract that either the directors or committee would guard the president's conduct; and, even though remiss in the discharge of their duties, this afforded no excuse for what Harbin did, and it was for his conduct only that the surety vouched. As said in the first of the above cases: " The principle contended for would tend to deprive the corporation of all remedy against one agent on account of the negligence or default of another. The cashier might excuse himself by pleading the failure of the directors to perform their duty, and the directors would excuse it themselves by showing that the cashier had been guilty of neglect of the trust devolved upon him." Of course, the circumstances may be such that the avoidance of knowledge can alone be attributed to perverseness on the part of the employer. But from proof of this kind knowledge is usually to be inferred. As observed in *Manchester Fire Ins. Co. v. Redfield,* 69 Minn. 10 (71 N. W. Rep.

709) : " Facts and circumstances so cogently suggestive of the probable dishonesty of the servant may come to the knowledge of the master that a failure to investigate the matter would be such gross negligence as to amount to bad faith or fraud toward the sureties."

In the instant case the assessments had been made for the benefit of the beneficiaries of deceased members, and the moneys realized were in the hands of the association for the purpose only of distribution to said beneficiaries. Neither the officers nor directors of the association had any right to make any other use of them. Any of them who participated in so doing violated the law and the articles of incorporation, and in no manner represented beneficiaries or the association in so far as it acted as trustees for such beneficiaries. Knowledge of the diversion of the funds so acquired cannot be imputed to the association. On three different occasions the president, secretary, and another — supposedly a director — on the pretense of acting as an executive committee, entered orders, one for the transfer of money from the beneficiary fund to the general fund " on account of the expense of first year's premiums, said amount having been expended in defense of the beneficiary fund against fraudulent claims," and the other two for the payment of small items for attorney's fees from such fund. As they were engaged in the commission of a wrong, their knowledge of what they did cannot be imputed to the association, then acting as the trustee of the funds taken. This is on the ground that, having perpetrated an act of fraud or dishonesty, of which the association as well as the beneficiary, whom it represented, might complain, they would not be likely to disclose what they had done to either, and for this reason they are not to be presumed to have imparted such information. *American Surety Co. v. Pauley,* 170 U. S. 133, and authorities therein cited. Possibly, had the information reached the board of trustees, it ought to have

acted in the matter. But the evidence cannot be said to show conclusively knowledge on the part of the board of the directors that money was being extracted from the beneficiary fund to pay the expenses of litigation, or that they were ever aware of overpayment to policy holders. It is true that an auditing committee occasionally examined the books, but these examinations seemed to have been made with reference to balances, and whether the officers had accounted for all moneys received. No attention seems to have been given to ascertaining as to whether the proper amounts were being paid to beneficiaries, or from what fund expenses were being drawn. The reports of the cashier were not in detail. Possibly, the directors may have known of the overpayment of policies, or the diversion of money from the beneficiary fund for the payment of expenses of litigation. If the district court could be said to have so found, its conclusions would have had evidence to sustain it. But a finding to the contrary was not without support in the record, and, as the finding of the trial court should be accorded the same effect as a verdict of a jury, we cannot interfere with the conclusion reached.— *Affirmed.*