The Perpetual Building & Loan Association v. United States Fidelity & Guarantee Company, Appellant.

Action on Employe's Bond: ADMISSION OF EVIDENCE. Where it is not shown to be the duty of an officer of a corporation to make certain reports, it is not error to refuse to permit a witness to state whether he knew such officer had failed to make a report.

Same: Statements of one director of a corporation to another regarding the "habits" of an employe are properly excluded as immaterial, where the kind of habits referred to are not disclosed.

Representation of Fact Equivalent of Warranty: FAILURE OF; ALLEGATION OF BAD INTENT: EVIDENCE. A failure of the warranty of a material fact, or of one made material by the terms of representations of a contract when equivalent to a warranty, if acted upon in issuing a contract of insurance, will defeat recovery, and if this defense is sufficient it is immaterial that bad intent is also alleged, but the party alleging bad intent cannot complain of the submission to the jury of the issue thus raised. Evidence considered and held not to establish a warranty.

Liability of Surety Company: NOT AFFECTED BY STATEMENT OF PRESIDENT OF LOAN ASSOCIATION. Where the certificate of the president of a building and loan association to a surety company stating that the accounts of an employe were correct in every respect, purported to be simply his statement made to the best of his knowledge and belief, the fact that at the time the auditing committee knew an error existed in the employe's accounts did not relieve the surety company from liability.

**Instructions:** BURDEN OF PROOF: SEPARATE DEFENSES. An instruction upon the burden of proof which requires the defendant to establish every defense is technically erroneous, but when followed by a separate statement of each defense with proper instructions, as to burden of proof, is harmless.

**Voluntary Conveyance Not a Settlement of Defalcation.** A voluntary conveyance of property to the loan association by its secretary, who had misappropriated its funds, with the request that it be applied to the first items of indebtedness, is not a settlement relieving the surety company from liability on its bond.

**Notice of Defalcation:** WHETHER GIVEN IN COMPLIANCE WITH BOND: JURY QUESTION: EVIDENCE. The bond of the surety company provided that it should be notified "immediately" upon a discovery of any defalcation. The question of timely notice was properly submitted to the jury, as it cannot be said as a matter of law that a delay of six or eight days in notifying the surety company ought not under the circumstances to be held a violation of the condition requiring immediate notice.

**Same:** WAIVER OF NOTICE. The surety company sent an inspector to investigate the loss, who stated that the company would require the books to be checked by an expert, and at his suggestion one was employed; *held*, that the company was charged with knowledge of what might be ascertained so as to constitute a waiver of notice and that this question was properly submitted to the jury, notwithstanding the fact the contract prohibited waiver by an inspector.

*Appeal from Black Hawk District Court.*—HON. A: S. BLAIR, Judge.

THURSDAY, DECEMBER 18, 1902.

ACTION on a bond executed by defendant as surety of A. I. Breckenridge as secretary of a building and loan association. Judgment against defendant, and it appeals.—*Affirmed.*

*Edwards & Longley* for appellant.

*Courtright & Arbuckle* for appellee.

LADD, C. J.—One Breckenridge was elected secretary of the plaintiff, a building and loan association, and, in

compliance with statute, furnished a bond in the sum of $4,000, with the defendant as surety, covering one year from February, 1899. At the request of defendant's agent, the president of the association, J. M. Groat, signed the following "employer's certificate" with "president" annexed: "The replies of the applicant herein are, to the best of my knowledge and belief, correct. He has been in the service of the Perpetual Building & Loan the past four years, and has always, to the best of my knowledge, performed his duties faithfully and satisfactorily, and in accordance with our rules and regulations. When last examined on the settlement December 31, 1898, his accounts were found in every respect correct; he is not, to my knowledge, at present, and never has been, in arrears or in default. I know of nothing in his habits or antecedents affecting his title to confidence, and I know of no reason why the bond applied for should not be granted." The defendant pleaded that this statement was intentionally false, and now takes exception to certain rulings bearing on such defense. Groat, when on the stand, was asked whether he knew, prior to January 1, 1899, that the secretary had failed to make to the directors of the association his semi-annual report in July previous, and was not permitted to answer. At that time there was no evidence that it was the duty of the secretary to make such a report, and therefore the ruling was correct.

1. ADMISSION of evidence.

One of the directors—Krapfel—was asked to give the substance of another director's remarks as to Breckenridge's habits in requesting him to be a member of the auditing committee. An objection was sustained in so "far as the word 'habits' is concerned." The kind of habits referred to was not disclosed. If good habits were intended, knowledge of these could not affect the risk except favorably. Many bad habits have no connection with business integrity. There is noth-

2. SAME: ——.

ing, then, to indicate the inquiry was material to any issue. Appellant argues that his question had reference to habits of intoxication. If so, the court was not advised thereof. The ruling was correct.

II. It appears that the auditing committee of the association, on January 25, 1899, reported the secretary's accounts correct, and that the president's certificate was based thereon. Inquiry on the trial developed the fact that this committee found that the debits to loans on stock was $121.67 greater than the credits. The secretary's attention was directed to this, and he explained it was evidently a mistake; that possibly a note had been mislaid, and that he would look it up. He offered to make it good by giving his wife's check for the amount, and did so. This was left with the member of the committee, to be held subject to discovering the error. It was subsequently paid. The evidence shows conclusively that the committee supposed the discrepancy the result of a clerical error or an oversight, and that, when corrected, they acted in entire good faith. The president knew nothing of it, and hence could not have entertained a fraudulent intent in executing the certificate. That question, however, was submitted to the jury, and so answered. But appellant insists

3. REPRESENTATION of fact equivalent to warranty: allegation of bad intent: evidence.

that, if the account was incorrect in fact, this renders the bond void. That the failure of the warranty of a material fact, or one made material by the terms of a contract or the representation thereof when construed as equivalent to a warranty, if acted upon in issuing a contract of insurance, will defeat recovery thereon, seems to be well settled. *Glade v. Insurance Co.*, 56 Iowa, 400; *Hunter v. Cure Co.*, 96 Iowa, 573; *Ring v. Assurance Co.* 14 N. E. Rep. 525; *Nelson v. Insurance Co.*, 110 Iowa, 600; *Association v. Lauderdale* 94 Tenn. 635 (30 S. W. Rep. 732.) And, if this defense were sufficient, it is not material that bad intent also was pleaded. Section 3639, Code.

But a careful reading of the certificate leads to the conclusion that Groat had the right to understand all his statements were on knowledge and belief only. True, the assertion that "his accounts were found in every respect correct," standing alone, purports to state a fact; but in every other sentence of the certificate, and even in this, following the semicolon, is a limitation to a present knowledge. The defendant, in alleging the statement to have been with evil intent, so interpreted the certificate, and it ought not to complain if its interpretaion is accepted and the court's action in instructing the jury accordingly approved.

Appellant argues that the president spoke for the association, and, as the auditing committee knew, he, in acting for the association, must be held to have had knowl-
4. LIABILITY edge. Reliance is placed on decisions to the
of surety Co.
not affected effect that a corporation, in ratifying an un-
by statement
of president authorized contract by its president, must
of loan as-
sociation. take it *cum onere*; that is, it cannot insist on
the contract right, and repudiate that unauthorized representation of the agent which to some extent constituted inducement to the other party. *Balfour v. Irrigation Co.* 123 Cal. 335, 55 Pac. Rep. 1062; *Eadie v. Ashbaugh*, 44 Iowa, 520; *Cassady v. Insurance Co.*, 109 Iowa, 559; *Fleishman v. VerDoes*, 111 Iowa, 322. The ready answer is that the certificate does not purport to be a statement of other than the president, and then only to the best of his knowledge and belief. He pretended to speak for no one but himself. Making the certificate was not within his duties as president, and the association is bound only in so far as the contract is based upon his individual assertions. As these were referred to in the bond, it was doubtless accepted subject to them. See *Surety Co. v. Pauly*, 170 U. S. 133 (18 Sup. Ct. Rep. 552, 42 L. Ed. 977).

III. The burden of proof was on the defendant on all issues except that of the giving immediate notice to defendant upon discovery of the defalcation. On that the

defendant assumed the burden of proof in order to obtain

5. INSTRUC-
TIONS: bur-
den of proof:
separate de-
fenses.

the right to open and close. On what theory it was allowed this option we are not advised. As plaintiff has not appealed, the propriety of allowing it cannot be considered. We may remark, however, parenthetically, that possibly one party may have as good right to retain the burden in order to open and close as the other to elect to assume it in order to acquire something the law has not conferred. The court, after stating the issues fully, in the first instruction told the jury that the burden was on the defendant to establish "every material allegation in its answer and amendment thereto in order to defeat plaintiff's right of recovery herein." This was technically erroneous in requiring more than one defense to be established. But it purported merely to state upon whom was the burden of proof, and was immediately followed by instructions relating to the preponderance and weight of evidence, the credibility of the witnesses, and the general principles of law governing the case. The defenses were then separately stated, and the jury instructed, as to each, if established, plaintiff could not recover. Surely, the general statement as to burden of proof in the first paragraph could not have misled the jury into supposing more was required than specifically stated as essential in considering the several defenses to justify a verdict for defendant.

IV. The bond provides: "That the company shall be notified in writing, addressed to the president of the company, at its office in the city of Baltimore, state of Maryland, of any act of omission or of commission on the part of the employe which may involve a loss for which the company is responsible hereunder, immediately after the occurrence of such act shall come to the knowledge of the employer. That any claim made in respect to this bond shall be in writing, addressed to the president of the company as aforesaid immediately after the discovery of

any loss for which the company is responsible hereunder, and within six months after the expiration or cancellation of this bond as aforesaid, * * * That this bond will become void as to any claim for which the company is responsible hereunder to the employer if the employer shall fail to notify the company of the occurrence of such act immediately after it shall have come to the knowledge of the employer. And if, without previous notice to and consent of the company thereto, the employer has intrusted or shall intrust the employe with moneys, securities, or personal property after having discovered any act of dishonesty, or condones any act for which the company may be liable hereunder, or makes any settlement with the employe for any loss hereunder, this bond shall be null and void, and any willful misstatement or suppression of facts in any claim made her eunder renders this bond void from the beginning." The acts of commission or omission necessarily relate to "pecuniary loss, sustained by the employer, of money, securities, or other personal property in the possession of the employe, or for the possession of which he is responsible, by any act of fraud or dishonesty on the part of the said employe in connection with the duties of the office or position of secretary."

It will be noted that the employer is not bound to notify the surety company of the act of fraud or dishonesty when discovered. Failure to do so merely defeats recovery as to that particular claim. It is only when such discovery is followed by intrusting moneys, securities, or personal property in the hands of the employe, or by condoning the act, or making settlement for any loss, that the contract becomes void. Breckenridge's employment ceased before his dishonesty was found out. The association accepted a conveyance of property of the stipulated value of $1,500, January 30, 1900. This was made voluntarily upon his own motion, and without any agreement whatever save that it was

6. VOLUNTARY
conveyance
not a settle-
ment of de-
falcation.

worth the amount stated, and his request that it be applied on the first items of his indebtednesss. This was a mere payment on his debt, not a settlement in the sense in which that word is ordinarily used.

V. "Immediately" is defined to be "without unnecessary or inexcusable delay under all circumstances." The briefs agree upon the accurancy of this definition, but

7. NOTICE of defalcation: whether given in compliance with bond; jury question: evidence.

appellant insists only one inference can be fairly drawn from the evidence, and that is that the notice was not given immediately upon discovery of the acts of defalcation, as required. A number of cases relating to accident insurance, holding notice in from six to twenty-nine days not in time, are cited. *Foster v. Casualty Co.* (Wis.) 75 N. W. Rep. 69 (40 L. R. A. 833); *Smith v. Insurance Co.* 171 Mass. 3 >7, 50 N. E. Rep. 516; *Whitehurst v. Insurance Co.* 7 Jones L. (N. C.) 433; *Assurance Co. v. Burwell*, 44 Ind. 460. But such injuries are of a more definite and certain character than losses like that in question. The accident is known at once, though the extent of the injury may be in doubt. In a case like this some time may elapse after a well-grounded suspicion before the employer ought, in prudence, to make any charge of fraud or dishonesty. Mere laches or inefficiency in business, consistent with integrity, are not enough. Knowledge of a defalcation frequently depends on a long train of events, or the examination of extended accounts. Discrepancies or irregularities, confirmatory in themselves of guilt, are often explainable, or turn out to be entirely inconsistent with innocence. The confidence of years is not ordinarily shattered in an instant, and the employer may be commendably slow to be convinced of the depravity of the person whom he has implicitly trusted. Unjust inferences and false accusations are always to be avoided. The truth, only after being ascertained with reasonable certainty, can be safely made known. Character is too sacred to permit of tolerating

a less liberal rule.   It is only of facts which may create a loss for which the surety is responsible—that is, a loss arising from fraud or 'dishonesty—that immediate notice is exacted.   *Pacific Fire Insurance Co. v. Pacific Surety Co.* 93 Cal. 7 (28 Pac. Rep. 42); *Ætna Life Insurance Co. v. America Surety Co.*, (C. C.) 34 Fed. Rep. 298. As said in *Surety Co. v. Pauly*, 170 U. S. 160 (18 Sup. Ct. Rep. 552, 42 L. Ed. 987), the obligee is bound to give notice ''only when satisfied that he had committed some specific act of fraud or dishonesty likely to involve loss to the association.''   Of necessity, resort must be had to the facts of each particular case in determining whether notice was given within the time stipulated.   And it is to be borne in mind that the condition relating to notice is not one precedent to the loss, but following it, and pertains more especially to the performance of the contract. *Washburn-Halligan Coffee Co. v. Merchants' Brick Mut. Fire Ins. Co.*, 110 Iowa, 423.   Such conditions, as they relate to the remedy, are not usually as strictly construed as those involving the essence of the agreement.   *Peele v. Society*, 147 Ind. Sup. 543 (44 N. E. Rep. 661).

Reverting now to the facts in the instant case, it may be said that Breckenridge had enjoyed the confidence of the members of the association for several years. Those who examined the books were slow to believe him guilty of wrongdoing.   November 1, 1899, the board of directors appointed a committee to request his resignation as secretary, and on the 22d day of that month he complied.   On the day of this request Dunham began checking up the pass books.   In doing so he found many items credited to the members in these books which were not charged to the secretary in the accounts of the association.   Upon Breckenridge's attention being directed to this, he readily agreed to the proper entry.   Hall began his examination of the books December 11th of the same year, and on that

day, in verifying the footings of the cash journal, a dis-crepancy of $200 was discovered. On January 15, 1900, a pass book was presented of which no account was found, and shortly afterwards—the exact date not appearing—Breckenridge admitted extracting small amounts without debiting himself therewith, and on January 30, 1900, con-veyed property heretofore mentioned. Up to this time those examining the books testify they were unable to say whether the errors found were the result of mistakes or intentional defalcations. But they knew of differences in the accounts, and must be charged with actual knowledge of his dishonesty, as early as a few days prior to January 30, 1900. About fifty items had been discovered, amounting to $3,760.83. Later the examination of an expert indica-ted an embezzlement of nearly $12,000 in 1899, and over $22,000 in all. At plaintiff's request the local agent of defendant notified it in writing of the loss February 5, 1900. The books were still being examined by the officers of the association. Under the circumstances disclosed, in view of defendant having assumed the burden of proof, we are inclined to think the question one fairly for the jury to determine. It cannot be said that, as a matter of law, plaintiff was necessarily satisfied that a loss existed because of the secretary's fraud and dishonesty earlier than a few days prior to January 30, and a delay of six or eight days, or even longer, where no prejudice could pos-sibly result, ought not, under the circumstances, to be held, as a matter of law, a violation of the condition re-quiring immediate notice. See *Surety Co. v. Pauly, supra*; *Lyon v. Assurance Co.*, 46 Iowa, 631. In *Harbour Com'rs v. Guarantee Co.*, 22 Can. Sup. Ct. 542, the court passed on the fact, not whether the issue as to giving notice in time should have been left to the jury.

VI. Upon receiving notice, defendant sent its in-spector, Snow, to Waterloo, on February 11th, to investi-gate the loss. His duty was to investigate osses; to look

into all the facts, and make reports to the company.  He
inquired of the officers what the shortage con-
sisted of, how it was found out, and what

the amount of it was, and received such information.  Upon
earning that Hall, who was still engaged in examining the
counts, though a bookkeeper, was not an expert account-
it, he informed the officers of the association that his
'company would not be willing to accept any checking of
those books except by a man who was a thorough expert."
t was thereupon arranged that an expert should be em-
loyed.  Snow suggested several, but Cannon was finally
nployed.  Notice of defalcations discovered by this expert
as given March 10th following.  Upon this state of the
ecord the court submitted to the jury whether defendant
aived notice as to the defalcations subsequently discov-
red.  Appellant contends, first, that knowledge on the
part of Snow that notice had not been given immediately
was not shown.  The objection is untenable, for the reason
that the instruction had no reference to discrepancies
known at the time the arrangement was made.

It is next urged that the inspector was without auth-
ority to waive notice.  His business was to investigate
losses.  So far as appears, methods of so doing were left
to his discretion.  In performing this duty, then he was
authorized to take such course in ascertaining the nature
and extent of Breckenridge's delinquencies as he might
deem proper, and fairly included is that of insisting upon
an examination of the books by an expert accountant.
The association was at the trouble and expense of employ-
ing Cannon in response to this demand, and we think it
not too much to charge defendant with knowledge of what
was going on, and likely to be ascertained, at least so far
as to constitute a waiver of notice until the work had
been completed.

The suggestion that a condition in the contract pro-
hibited waiver by the inspector is disposed of by *Wash-*

*burn-Halligan Coffee Co. v. Merchants' Brick Mut. Fire Ins. Co., supra.* Instructions ten and eleven state the law as favorably as defendant was entitled to have it. The defense of waiver was pleaded. Other matters argued are disposed of by what has already been said.—AFFIRMED.