[No. 37762. Department Two. February 3, 1966.]

TRADEWELL STORES, INC., *et al., Respondents,* v. THE FIDELITY AND CASUALTY COMPANY OF NEW YORK, *Appellant,* THE AETNA CASUALTY & SURETY COMPANY, *Respondent.*\*

*Robert P. Piper* (of *Karr, Tuttle, Campbell, Koch & Granberg*), for appellant.

*Ryan, Askren, Carlson, Bush & Swanson,* for respondents.

\*Reported in 410 P.2d 782.

WEAVER, J.—Defendant, The Fidelity and Casualty Company of New York (hereafter referred to as Fidelity) appeals from an Order Granting Summary Judgment and a Summary Judgment entered against it in the amount of $16,756.24.

Although we are confronted, as was the trial court, with a formidable record of depositions, affidavits, interrogatories, requests for admissions, and numerous demands to produce documents, the ultimate facts are comparatively simple and not in dispute.

Plaintiffs-respondents, Tradewell Stores, Inc. and Pacific Gamble Robinson Co. (hereafter referred to as Tradewell) operate a number of retail grocery markets in Washington and Oregon. For about 5 or 6 years prior to January 9, 1962, the Tradewell store in Shelton was managed by Eldred P. Boe.

From 1957 until December 31, 1961, plaintiffs were insured by successive comprehensive fidelity insurance contracts by which Fidelity agreed to pay plaintiffs for loss of money and securities which plaintiffs sustained by reason of fraudulent or dishonest acts committed by any of plaintiffs' employees. January 1, 1962, defendant, The Aetna Casualty & Surety Company, became the insurer. Summary judgment for $809.62 was entered against Aetna for plaintiffs' losses sustained between January 1 and January 9, 1962. Aetna has not appealed.

As manager, Mr. Boe was to make a daily sales report, deposit the daily cash receipts in a Shelton bank, and forward the sales report and deposit slip to Tradewell's Seattle office. He was frequently late, especially commencing in 1960, in making his daily report and bank deposit. Mr. Boe, however, was considered by the principals of Tradewell to be an excellent store manager in all respects; he was considered to be of unimpeachable honesty and integrity. When queried as to why his deposits were late, Mr. Boe always responded with an explanation that seemed reasonable to Tradewell.

In the early part of January, 1962, Mr. Boe's late deposits caused an overdraft in the Shelton bank. The company

comptroller and district supervisor conducted an audit which indicated a substantial shortage[1] resulting from Mr. Boe's false reports and his use of the subsequent days' cash receipts to cover shortages in prior days' deposits. Notice of the shortage was immediately given to the insurers.

During the period in question, plaintiffs were the named insureds in three blanket commercial fidelity bonds. Although the wording of each varies in some minor respects, it is not contended that the variance is material. The policies provided:

Employee dishonesty coverage Form B:

1. Through any fraudulent or dishonest act or acts, committed anywhere by any of the Employees acting alone or in collusion with others, including loss of Money and Securities and other property through any such act or acts of any of the Employees . . . .

Loss—Notice—Proof—Action Against Company

Section 8. Upon knowledge or discovery of loss or of an occurrence which may give rise to a claim for loss, the Insured shall: (a) give notice thereof as soon as practicable to the Company or any of its authorized agents and, except under Insuring Agreements I and V, also to the police if the loss is due to a violation of law; (b) file detailed proof of loss, duly sworn to, with the Company within four months after the discovery of loss.

We do not agree with defendant's contention that there is a genuine issue of a material fact which aborts the summary judgment. There is no issue of fact as to the total amount of money that Tradewell did not receive during the period involved; nor is there any dispute that the shortage did not result from the dishonest "act or acts" of Mr.

---

[1]A certified public accountant who audited the books of the Shelton store made an uncontroverted affidavit in which he stated that the records indicated that funds were missing and unaccounted for as follows:

| | |
|---|---|
| November 5, 1958 to December 31, 1959 | $2,891.88 |
| December 31, 1959 to December 31, 1960 inclusive | 11,621.12 |
| January 1, 1961 to December 31, 1961 inclusive | 2,743.24 |
| January 1, 1962 to January 8, 1962 inclusive | 809.62 |

The losses for the first three periods set forth above were designated as "minimum"; the last as "maximum".

Boe, the manager. Plaintiffs acquired actual knowledge of the shortage and dishonesty on January 9, 1962, at which time they notified defendant. The question is the legal significance of the material facts in the light of the policy provisions quoted *supra*. It is not a question for a trier of facts.

*Remington v. Fidelity & Deposit Co. of Maryland*, 27 Wash. 429, 67 Pac. 989 (1902), upon which defendant relies, is not apposite. In *Remington* the employer waited 44 days *after* learning of his employee's dishonesty before giving notice to the insurance company. Whether notification was timely was held to be a jury question. In the instant case the question is whether the insurance contracts obligated the insured to notify the insurer prior to obtaining actual knowledge of dishonesty. In the case before us notice was given immediately upon discovery of the defalcation.

Defendant contends that Mr. Boe's frequent tardiness in making bank deposits was sufficient, as a matter of law under the policies, to constitute "an occurrence which may give rise to a claim of loss" requiring "notice thereof as soon as practicable."

█ The policies are, as described by the trial judge, "of wide coverage of insurance for dishonesty." We agree with his interpretation of them that Tradewell was only required to give notice after acquiring *actual* knowledge of the shortage. Tardiness alone was not sufficient to constitute knowledge of Mr. Boe's dishonesty.

The court said in *Perpetual Bldg. & Loan Ass'n v. United States Fidelity & Guarantee Co.*, 118 Iowa 729, 92 N.W. 686 (1902):

> Knowledge of a defalcation frequently depends on a long train of events, or the examination of extended accounts. Discrepancies or irregularities, confirmatory in themselves of guilt, are often explainable, or turn out to be entirely inconsistent with innocence. The confidence of years is not ordinarily shattered in an instant, and the employer may be commendably slow to be convinced of the depravity of the person whom he has implicitly trusted. . . . Character is too sacred to permit of tolerating a less liberal rule.

The mere want of punctuality in making deposits or remittances, or delays acquiesced in by plaintiff, unassociated with dishonesty, would not require giving of notice stipulated in the policies. *National Sur. Co. v. Western Pac. Ry.,* 200 Fed. 675 (9th Cir. 1912), *cert. denied* 229 U.S. 616.

We find that our conclusion is fortified by the decisions cited and discussed in the annotations set forth in the margin.[2]

The judgment is affirmed.

ROSELLINI, C. J., FINLEY and HAMILTON, JJ., and BARNETT, J. Pro Tem., concur.

[2]Duty of employer to notify surety that employee was dilatory, slow, or negligent in settling account. 60 A.L.R. 160; Suspicion, or reasons for suspicion, of wrongdoing by officer or employee covered by fidelity bond or policy, as requiring obligee to comply with conditions of bond with respect to notice of discovery or knowledge of loss. 129 A.L.R. 1411.