[No. 61914-0.   En Banc.]
Argued May 23, 1995.      Decided July 11, 1996.

OLDS-OLYMPIC, INC., *Appellant,* v. COMMERCIAL
UNION INSURANCE COMPANY, ET AL., *Respondents.*

*Reaugh Fischnaller & Oettinger, P.S.*, by *Sylvia Luppert*, for appellant.

*Cusack & Knowles*, by *Kenneth J. Cusack; Jose E. Gaitan*; and *Hagens & Berman*, by *Jeffrey C. Grant* and *Jenniphr A. Breckenridge*, for respondents.

*Allan W. Munro, Charles C. Gordon, Jeffrey I. Tilden, Thomas S. James, Jr., Eugene Anderson, Robert Horkovich, Peter J. Andrews*, and *William Passannante*, amici curiae.

TALMADGE, J. — Olds-Olympic, Inc. (Olds-Olympic) seeks indemnification from its primary and excess comprehensive general liability (CGL) insurers, Commercial Union Insurance Co. (Commercial Union) and Fireman's Fund Insurance Co. (Fireman's Fund) for costs incurred in removing contaminated soil that had allegedly polluted the groundwater under its Stone Way site near Lake Union in Seattle. The King County Superior Court entered a judgment on the verdict of the jury denying insurance coverage to Olds-Olympic. Although the jury made the necessary factual findings to support coverage under the CGL policies issued to Olds-Olympic when it found property damage to the State's groundwater caused by an occurrence, the jury further determined Olds-Olympic had no legal liability for that property damage.

Because the jury was not properly instructed on the question of Olds-Olympic's legal liability for the remedia-

tion of the property damage at its Stone Way site, we reverse the judgment of the King County Superior Court and remand the case for a new trial confined to the question of Olds-Olympic's legal liability for the costs of the remediation of the contamination to the groundwater, and damages, if any.

## ISSUES

1. Did the trial court erroneously instruct the jury on the question of Olds-Olympic's legal liability for the damage to the State's groundwater under the CGL policies?

2. Did the trial court err in failing to dismiss the insurers' late notice defense?

## FACTS

Olds-Olympic operated a home heating oil distribution facility at 3410 Stone Way North in Seattle near Lake Union for 58 years. Three 20,000-gallon underground storage tanks for oil were installed at the site in the 1950's. In 1970, two additional 250-gallon waste oil tanks were installed. Olds-Olympic also had an underground gasoline storage tank for fueling company vehicles on the site.

Two major fuel spills occurred on the site in 1972 and 1974. In 1972, a Shell Oil tank overturned at the Stone Way property, spilling approximately 4,200 gallons of diesel fuel into the soil. Only 500 gallons of the fuel were recovered. The subsequent spill involved several thousand gallons of heating oil which spilled onto the ground after pumps were activated because a previous user had not properly closed a fuel valve.

In 1985, Olds-Olympic sold the Stone Way site to Wayne Singleton, but continued to lease the property from him for its oil business. In 1986, Olds-Olympic ceased operating its home heating oil distribution facility, and discontinued using the underground storage tanks on the site, but used the site for other purposes.

In December 1988, Olds-Olympic notified the Department of Ecology (DOE) of the potential pollution resulting from a leaking underground storage tank on the Stone Way site, but leaks from the tank were not a major oil contamination source.[1]

In June 1989, the Fremont Dock Company (Fremont Dock) purchased the Stone Way property from Singleton. Under the sales agreement, Fremont Dock agreed to remove the underground storage tanks, and contracted with a firm to remove the fuel handling facilities and underground storage tanks. Olds-Olympic learned of potential contamination of the soil at the Stone Way site from Fremont Dock when the first storage tank was removed.

Olds-Olympic hired environmental consultants to document the environmental conditions during removal of the remaining underground storage tanks and to recommend remedial action for the site. Ultimately, Olds-Olympic removed the underground storage tanks and the contaminated soil from the site in 1989-90. During this period, Washington State Department of Ecology (DOE) officials visited the Stone Way site and advised Olds-Olympic about the disposition of contaminated soils and notified Olds-Olympic about the recommended levels of groundwater cleanup in light of a petroleum-related hazard.[2] Olds-Olympic's environmental consultants advised it that,

---

[1]In 1990, Olds-Olympic installed three monitoring wells to test the groundwater on the Stone Way property. With the exception of one, all tests from the three monitoring wells indicated groundwater contaminants were below State and Federal cleanup requirements. This determination was confirmed in a May 1993 laboratory report on groundwater sampling of monitoring wells at the Stone Way site, which indicated the "measurements of contaminants, petroleum hydrocarbons, benzene, toluene, [and] xylene . . . were below the minimum standards set forth by the Department of Ecology." Report of Proceedings at 934.

[2]Joseph M. Hickey, an environmental supervisor with DOE, testified at trial that he visited the Stone Way site, completed a DOE Environmental Complaint Form against Olds-Olympic on December 19, 1988, Ex. 113, and opened a file on this independent cleanup. DOE sent letters to Olds-Olympic advising it how to dispose of contaminated soils, informing Olds-Olympic that petroleum-related contamination required remediation, and notifying Olds-Olympic of recommended groundwater cleanup levels. Ex. 55. ("The Department of Ecology, as

under Washington law, original operators of the site during the contamination period would ultimately be held responsible for cleanup of the site. This duty was confirmed by DOE officials.[3]

Although DOE, the Singletons, or Fremont Dock, did not file a lawsuit against Olds-Olympic and DOE did not initiate any of its other formal enforcement actions under RCW 70.105D, Olds-Olympic was not operating in a legal vacuum. Both Mr. Singleton and John Mead of Fremont Dock testified they hired legal counsel and advised Forrest Bailey of Olds-Olympic they intended to hold Olds-Olympic responsible for the problems at the Stone Way site. Report of Proceedings at 835-36, 846-48. Olds-Olympic received a demand letter from Singleton and Fremont Dock, advising it would be held responsible for any cleanup of the Stone Way site. Report of Proceedings at 328-29. DOE sought voluntary compliance with cleanup standards (an "independent cleanup") by Olds-Olympic before initiating any formal action. Report of Proceedings at 491, 577-78.[4]

---

I'm sure you're aware, has been monitoring the voluntary clean-up of the Olds-Olympic site at the above-referenced address"); Ex. 56, 114.

[3]In describing a conversation with DOE's Joseph Hickey at the Stone Way site, Bailey testified:

> He told us that we were responsible for cleaning the site up, since because we had owned and operated the site during the period of contamination. He advised us that if we would take a proactive position and try to clean the site up under his or under a third party environmental engineering firm's guidance that he approved, that he would allow us to clean it up under our own means.
>
> And he advised me that if we did not do that, he would take control of the project, he would clean it up or have it cleaned up and the State would hold us responsible for the payment of that cleanup fee.
>
> He advised me to do it on our own. He said, "Your methods will probably be far more economical than the State's would." So he said, "If you will make an effort to do this on your own, as long as I can approve the method," he said, "it'll be far more economical for you."

Report of Proceedings at 331-33.

[4]DOE regulations specifically recognize independent remedial actions as an administrative option for remedial action along with DOE-initiated remedial action. WAC 173-340-510(5).

Olds-Olympic paid for the cost of removing the contaminated soil on the site. It contends the cleanup of groundwater was effectuated by passive remediation, the removal of the soil rather than the groundwater. Prior to removing the soil, but after the contacts with Singleton, Fremont Dock, and DOE, Olds-Olympic sought insurance coverage from its CGL carriers. Commercial Union, by letter of December 11, 1989, denied any duty to defend or cover Olds-Olympic. Ex. 28. Shortly thereafter, Fireman's Fund sent a letter to Olds-Olympic denying a defense or coverage under the excess CGL policy. Ex. 154.

■ In 1992, Olds-Olympic filed the present action against its insurers seeking a declaration of coverage under the policies for remediation costs it incurred at the Stone Way site, and for damages and attorney fees under the Consumer Protection Act, RCW 19.86.[5] The case was tried in the King County Superior Court against Commercial Union and Fireman's Fund. The jury returned a verdict in favor of Commercial Union and Fireman's Fund. In specific response to interrogatories, the jury found there was property damage to the groundwater of the State as a result of an occurrence at the Stone Way site, but Olds-Olympic did not have a legal obligation with respect to the property damage to the groundwater. The trial court entered judgment upon the verdict, and subsequently denied Olds-Olympic's motion for judgment notwithstanding the verdict or for a new trial. We accepted direct review in this case.

---

[5]The trial court dismissed Olds-Olympic's claims under RCW 19.86 at the end of Olds-Olympic's case, finding Olds-Olympic had failed to present specific evidence of unreasonable conduct by the insurers in their investigation of Olds-Olympic's claim, or in their denial of a defense to Olds-Olympic and coverage. Olds-Olympic assigned error to the dismissal of the RCW 19.86 claim. We affirm.

An insurer's denial of coverage, even if erroneous, does not constitute bad faith and violate RCW 19.86 unless the insurer's actions were unreasonable, frivolous, or untenable. *Transcontinental Ins. Co. v. Washington Power Util. Dists.' Util. Sys.*, 111 Wn.2d 452, 760 P.2d 337 (1988). Given the close nature of the issues in this case, we cannot say the insurers acted frivolously or without reasonable justification.

## ANALYSIS

### 1. <u>THE INSURANCE CONTRACTS</u>

Commercial Union insured Olds-Olympic by a CGL policy which contained the following insuring agreement for the period from 1974 to 1984:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent and may make such investigation and settlement of any claim or suit as it deems expedient . . . .

Ex. 12. Commercial Union provided similar coverage to Olds-Olympic for the period from 1966 to 1974. Fireman's Fund provided a similar CGL coverage to Olds-Olympic excess to the coverage of Commercial Union. The policies also covered Olds-Olympic for liability assumed by a contract.

▮ Insofar as Commercial Union and Fireman's Fund received premiums from Olds-Olympic for CGL coverage, their insurance obligation is interpreted in a fashion consistent with the undertaking described in the policy label. Insureds are not purchasing "almost comprehensive" coverage. CGL policies are marketed by insurers as comprehensive in their scope and should be strictly construed when the insurer attempts to subtract from the comprehensive scope of its undertaking.

In the present case, the Commercial Union CGL policy contained an "owned property" exclusion, which excluded coverage for first party events pertaining to the property of the insured. The exclusion stated:

This insurance does not apply: . . . to property damage to (1) property owned or occupied by or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control; . . .

Ex. 12. The Fireman's Fund policy contained similar exclusionary language relating to the owned property of the insured.

## 2. WASHINGTON'S MODEL TOXIC CONTROL ACT

The general basis for the legal liability of Olds-Olympic to the State of Washington or by contract to the Singletons and Fremont Dock for their liability to the State of Washington is the Model Toxic Control Act of 1989 (MTCA). Washington adopted the MTCA in 1989 pursuant to Initiative Measure No. 97. RCW 70.105D et seq. governs liability for damages caused by hazardous substance releases. While the Act is designed to deal both with the remediation of former environmental hazards and to prevent environmental hazards in the future, a past or present property owner is strictly liable for the remediation of environmental hazards caused by hazardous substances it released or were released on its property. RCW 70.105D.040(2).[6] Petroleum products are among the hazardous substances regulated by MTCA. RCW 70.105D.020(6)(d).

---

[6]RCW 70.105D.040 provides:

(1) Except as provided in subsection (3) of this section, the following persons are liable with respect to a facility:

    (a) The owner or operator of the facility;

    (b) Any person who owned or operated the facility at the time of disposal or release of the hazardous substances;

    (c) Any person who owned or possessed a hazardous substance and who by contract, agreement, or otherwise arranged for disposal or treatment of the hazardous substance at the facility, or arranged with a transporter for transport for disposal or treatment of the hazardous substances at the facility, or otherwise generated hazardous wastes disposed of or treated at the facility;

    . . . .

■ ■ For purposes of liability coverage, voluntary cleanup costs incurred by an insured under MTCA may be damages, even in the absence of a formal enforcement action by the State. In *Boeing Co. v. Aetna Casualty and Sur. Co.*, 113 Wn.2d 869, 784 P.2d 507 (1990), we held costs the insured was required to pay to the State as reimbursement for cleanup under MTCA were "damages" the insured was legally obligated to pay within the meaning of a CGL policy. We noted "coverage does not hinge on the form of action taken or the nature of relief sought. . . ." *Id.* at 878 (quoting *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 662 F. Supp. 71, 75 (E.D. Mich. 1987)). Even *voluntary* cleanup costs have been found to be damages within the meaning of a CGL policy, particularly where the voluntary cleanup of groundwater prevented much greater damage and the court wished to encourage quick remedial action. *Upjohn Co. v. New Hampshire Ins. Co.*, 178 Mich. App. 706, 444 N.W.2d 813 (1989), *rev'd on other grounds*, 476 N.W.2d 392 (Mich. 1991). Similarly, in *Weyerhaeuser Co. v. Aetna Casualty and Sur. Co.*, 123 Wn.2d 891, 874 P.2d 142 (1994), we held it would be a "reasonable reading" of a CGL policy to conclude there is coverage even prior to a suit or formal claim where a statute imposes liability and there has been property damage. *Id.* at 913 (reversing summary judgment for insurers).

## 3. THE INSURERS' COVERAGE OF OLDS-OLYMPIC

The principal issue is whether the CGL policies afforded coverage to Olds-Olympic for Olds-Olympic's liability to the State under MTCA for the cost of remediating groundwater pollution.[7] The CGL policies generally

---

(2) Each person who is liable under this section is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances. The attorney general, at the request of the department, is empowered to recover all costs and damages from persons liable therefor.

[7]Olds-Olympic also raises a question about whether the insurers improperly denied a duty to defend Olds-Olympic under their policies. The insurers denied

require coverage for the insured where the insured becomes legally obligated to pay damages because of property damage caused by an occurrence. The exclusionary language in the policies makes clear the property damage must be to the property interest of another rather than to the property owned by the insured itself.

In the present case, the trial court instructed the jury in instruction 14[8] that Commercial Union undertook to cover Olds-Olympic pursuant to the CGL policy. In instruction 19,[9] the trial court defined "property damage" under

the duty to defend because no formal lawsuit was filed against Olds-Olympic by DOE, Singleton, or Fremont Dock, and DOE had not designated Olds-Olympic a Potentially Liable Party (PLP) or otherwise commenced formal enforcement actions under RCW 70.105D. In *Weyerhaeuser Co.*, a case involving CGL coverage, we rejected the view an insured must stop voluntary environmental cleanup efforts under MTCA and be sued in order to obtain coverage. *See also Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (1993). Case law from around the country, however, is split on what constitutes a "suit" for purposes of the duty to defend in environmental cleanup cases. MITCHELL L. LATHROP, INSURANCE COVERAGE FOR ENVIRONMENTAL CLAIMS § 3.04, at 3–45 (1992).

We need not address here whether there was a legal duty to defend, as the trial court found Olds-Olympic had failed to present any evidence of damages flowing from the alleged breach of the duty to defend, and, as a result, dismissed the claim at the conclusion of Olds-Olympic's case. *Report of Proceedings* at 1215–17. Olds-Olympic has not argued on appeal the trial court's factual determination as to lack of evidence concerning damages was erroneous.

[8]Instruction 14 stated:

If you have found that Commercial Union issued policies with the terms and conditions in each of the years claimed by Olds-Olympic, you must then determine whether Olds-Olympic had coverage under the Commercial Union policies.

The copies of Commercial Union's comprehensive general liability policies contain the following language:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of property damage to which this insurance applies caused by an occurrence.

Clerk's Papers at 804.

[9]Instruction 19 provided:

"Property damage" as the term is used in the insurance policies and these instructions means physical injury to or destruction of tangible property which occurs during the policy period.

Clerk's Papers at 808.

the policy, and in instruction 20[10] defined "legal obligation or liability" within the meaning of the policy. The trial court instructed the jury in instruction 21[11] on strict liability. The trial court instructed the jury with respect to the owned property exclusion in the Commercial Union CGL policy in instructions 23[12] and 24,[13] and attempted to inform the jury about the distinction between damages and "preventative measures" in instruction 22.[14]

---

[10]Instruction 20 stated:

A "legal obligation" or "liability" as the term is used in the insurance policies and these instructions includes compliance with a statute which imposes strict liability for cleanup of groundwater.

Clerk's Papers at 809.

[11]Instruction 21 provided:

There are statutes that may impose strict liability on any person or company who owned property at the time there was a release of any hazardous substance on the property at any time in the past. "Strict liability" means that liability is imposed whether or not the person or company was at fault for the release.

Clerk's Papers at 810.

[12]Instruction 23 provided:

The copies of Commercial Union's comprehensive general liability policies provide:

This insurance does not apply to property damage to: (1) property owned or occupied or rented to the insured, (2) property used by the insured, or (3) property in the care, custody, or control of the insured or as to which the insured is for any purpose exercising physical control . . . or to property damage to premises alienated by the named insured arising out of such premises or any part thereof.

Commercial Union has the burden of proving that this provision applies.

[13]Instruction 24 provided:

The Fireman's Fund policies provide, in part, that the policies do not apply, under Property Damage Liability "to property damage to (1) property owned by the insured . . ."

Fireman's Fund has the burden of proving that this provision applies.

[14]Instruction 22 provided:

Washington law considers that policyholders' costs of complying with environmental remediation or cleanup laws and regulations are "damages" within the meaning of comprehensive general liability insurance policies.

Under the trial court's coverage instructions, the jury was asked if an "occurrence" took place during any year at the Stone Way site. The jury answered affirmatively. The jury found occurrences took place in 1972, 1973, 1974, 1975, and 1988. The jury was then asked: "Was there property damage to groundwater as a result of an occurrence at the Stone Way site?" The jury answered affirmatively. In the next interrogatory, the jury found property damage to groundwater from 1972 to 1990. All of the parties in this case concede the groundwater belonged to the State of Washington, a third party, under RCW 90.44.040[15] and article XXI, section 1 of our constitution.[16] Br. of Appellant Olds-Olympic at 17; Br. of Resp't Commercial Union at 26; Br. of Resp't Fireman's Fund at 15. In light of the jury's answer to the interrogatories, property damage to the property of a third party resulted from an occurrence. Such damage ordinarily would invoke the coverage under the CGL policies.

■■ However, under the policies' insuring agreements, coverage is provided for damages the insured "shall become legally obligated to pay. . . ." The trial court submitted the following additional interrogatory to the jury: "Was there a legal obligation or liability because of property damage to groundwater for any year?" Clerk's Papers at 828. The jury answered "no." This interrogatory was ambiguous.

The insurers contend the jury determined there was no

Preventive measures taken before property damage has occurred are not costs incurred because of property damage.

[15]RCW 90.44.040 provides:

Subject to existing rights, all natural groundwaters of the state as defined in RCW 90.44.035, also all artificial groundwaters that have been abandoned or forfeited, are hereby declared to be public ground waters and to *belong to the public* and to be subject to appropriation for beneficial use under the terms of this chapter and not otherwise.

(Emphasis added.)

[16]WASH. CONST., art. XXI, § 1 provides:

The use of the waters of this state for irrigation, mining and manufacturing purposes shall be deemed a public use.

legal obligation or liability for cleanup because the damage to the groundwater was below minimum mandated levels. The jury was not asked to determine, however, whether the damage to the groundwater was above or below minimum mandated levels. The jury was left to speculate as to what levels of groundwater contamination are sufficient to provoke a MTCA response. Instruction 20 is not specific enough to guide the jury. It speaks only to "compliance with a statute which imposes strict liability for cleanup of groundwater." Clerk's Papers at 809. The jury was not instructed as to what "compliance" is in this case. While the jury may well have concluded the damage to the groundwater was not severe enough to give rise to liability to remediate the groundwater, and therefore, no legal obligation or liability arose on the part of Olds-Olympic to the State, that question was not specifically posed to the jury.

An equally compelling argument could be made the real purpose of the interrogatory was to determine whether or not Olds-Olympic acted under any legal compulsion or was simply acting voluntarily to prevent a future problem. If the intent of the ambiguous interrogatory was for the jury to decide whether there is no legal obligation or liability because Olds-Olympic's actions were voluntary and designed to prevent future harm that had not yet occurred, instruction 22 was insufficient to assist the jury on the law. Instruction 22 advised: "Preventive measures taken *before* property damage has occurred are not costs incurred because of property damage." Clerk's Papers at 811 (emphasis added). Plainly, any remedial steps by Olds-Olympic *post-dated* the property damage to the groundwater. Thus, the jury was not advised of the legal difference between the remediation Olds-Olympic was obliged to undertake and preventive measures not covered by a CGL policy. In *Boeing Co. v. Aetna*, we illustrated costs that are not incurred "because of" property damage by citing the following example:

Petitioners have two underground storage tanks for toxic

wastes. Tank #1 has leaked wastes into the soil which have migrated to the groundwater or otherwise polluted the environment. Tank #2 has not leaked, but government inspectors discover that it does not comply with regulatory requirements, and could eventually leak unless corrective measures are taken. Response costs associated with Tank #1 will be covered as damages, because pollution has occurred. Tank #2 would not be covered. Likewise, the expense of capital improvements to prevent pollution in an area of a facility where there is none, or improvements or safety paraphernalia required by government regulation and not causally related to property damage, would not be covered as "damages."

113 Wn.2d at 886-87 (quoting *Aerojet-General Corp. v. San Mateo County Superior Court*, 257 Cal. Rptr. 621, 635, *supplemented by* 258 Cal. Rptr. 684, *review denied*, Aug. 10, 1989)). Given the policy we enunciated in *Weyerhaeuser* that voluntary cleanup is within the coverage provisions of a CGL policy, and based on the evidence here, this case is more in the nature of the Tank 1 example than the alternative.[17] The trial court erred in giving instruction 22 to the jury.

Finally, another conceivable meaning for the interrogatory could be whether Olds-Olympic's remediation efforts pertained to the groundwater or to its own property. If the intent of the interrogatory was for the jury to decide whether Olds-Olympic's remedial efforts pertained to its own property, and not the groundwater, instructions 23 and 24 offer little help to the jury. An owned property exclusion prevents a CGL policy from providing first-party benefits to the insured. TOD I. ZUCKERMAN AND MARK C.

---

[17]There is a split of authority as to whether the owned property exclusion prevents coverage when the cleanup of the insured's property prevents potential damage to the property of a third party. Appleman contends an owned property exclusion bars coverage for costs incurred in cleaning up pollution that has contaminated the insured's property, even if the cleanup is designed primarily to prevent threatened migration of the pollution to the property of another. 7A JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 4526 (Supp. 1994). *But see Unigard Mut. Ins. Co. v. McCarty's, Inc.*, 756 F. Supp. 1366 (D. Idaho 1988). This situation is not present here because the jury found *actual* damage to the State's groundwater.

RASKOFF, ENVIRONMENTAL INSURANCE LITIGATION § 7.02, at 7-4 (Supp. 1994). Third party insurance involves protection for the policyholder for liability it incurs to someone else, while first party insurance involves protection for losses to the policyholder's own property. *Weyerhaeuser*, 123 Wn.2d at 909.[18]

The jury here determined there was injury to the groundwater, the property of the State. The "owned property" exclusions did not apply to Olds-Olympic because the groundwater at issue in this case was neither owned nor within the "care, custody, or control" of Olds-Olympic.[19] In *Madden v. Vitamilk Dairy, Inc.*, 59 Wn.2d 237, 367 P.2d 127 (1961), we indicated the words "care, custody or control" in a CGL policy are unambiguous and must be given their plain, ordinary meaning. We stated:

---

[18]Citing *Unigard Mut. Ins. Co. v. McCarty's, Inc.*, 756 F. Supp. 1366 (D. Idaho 1988), a case no other court has cited for the same proposition, Olds-Olympic earnestly argues it was "legally obligated to remediate the soil under compulsion of MTCA for property damage to the environment." Br. of Appellant at 26-27. *McCarty's* found coverage in a policy identical to the ones at bar for harm to a third party, the State, due to "PCB dumping [that] harmed the environment and endangered the public." *Id.* at 1369-70. Olds-Olympic asserts "the owned and alienated property exclusions do not bar coverage when property damage is to a government property interest." Br. of Appellant at 23. We disagree.

While the State undoubtedly has a police power interest in regulating the environment, that interest does not rise to the level of a property interest cognizable under present insurance contracts. A court must give an insurance policy as fair, reasonable, and sensible a construction as an average person would. *Weyerhaeuser Co.*, 123 Wn.2d at 897; *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993), *supplemented by* 123 Wn.2d 131, 865 P.2d 507 (1994). We decline to read into the language of the policies in this case the promise to indemnify Olds-Olympic for general environmental damage unattached to any specific property interest.

[19]*See* KENNETH S. ABRAHAM, ENVIRONMENTAL LIABILITY INSURANCE LAW 169 (1991) (in many cleanups, the nonowned property in question is groundwater under the policyholder's property and most states consider groundwater to be a public resource that is not owned, or not owned exclusively, by the party under whose land it is situated); ZUCKERMAN & RASKOFF, *supra*, § 7.04 at 7-5 (Supp. 1994) (neither surface water nor groundwater has generally been held to be property owned by the insured for purposes of the owned property exclusion); Eugene L. Annis, *The Owned Property and Care Custody and Control Exclusions of the Comprehensive General Liability Policy*, 28 GONZ. L. REV. 438, 444 (1993) (in jurisdictions where the surface and groundwaters are deemed owned by the state or the public, the owned property exclusion of a CGL policy does not prevent coverage); RCW 90.44.040.

Where the property damaged is merely incidental to the property upon which the work is being performed by the insured, the exclusion is not applicable. . . . However, where the property damaged is under the supervision of the insured and is a necessary element of the work involved, the property is in the "care, custody, or control" of the insured.

*Id.* at 239 (quoting *International Derrick & Equip. Co. v. Buxbaum*, 240 F.2d 536 (1957)).

The plain language of "care, custody, or control" does not support application of the owned property exclusion here. Groundwater was not essential to Olds-Olympic's business. The State did not grant a permit for use of the groundwater to Olds-Olympic. Moreover, there is nothing in the record to indicate Olds-Olympic asserted control over the groundwater. Consequently, the owned property exclusion is inapplicable here with respect to the groundwater.[20]

In summary, the trial court's instructions on legal liability were insufficient to advise the jury of the circumstances under which legal liability for cleanup of the State's groundwater would be present. The jury's answer to interrogatory 8 was therefore ambiguous. A retrial is necessary to obtain a definite determination of the crucial issue in this case.

### 4. THE INSURERS' LATE NOTICE DEFENSE

■ Both the Commercial Union and Fireman's Fund policies contained substantially similar notice requirements, which provided in pertinent part:

Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof[,] and the names and addresses of the injured and if available[,] wit-

---

[20]Under any CGL policy, only those portions of cleanup costs necessary to prevent further degradation of property belonging to another will be covered, given the owned property exclusion. Any portion of the cleanup affecting only the insured's property would still be subject to such an exclusion.

nesses shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

Olds-Olympic notified the insurers of the loss "as soon as practicable" even though the events producing the loss occurred much earlier. *Tradewell Stores, Inc. v. Fidelity & Casualty Co.*, 67 Wn.2d 919, 410 P.2d 782 (1966) (duty to notify "as soon as practicable" satisfied when insured notified insurer after it acquired actual knowledge of the loss). Thus, we hold there was no late notice in this case, and we remand for dismissal of the late notice defense.[21]

## CONCLUSION

The jury in this case made the necessary factual determination to support coverage under the CGL policies. It determined there was damage to the property of another (the State's groundwater) caused by an occurrence.

The jury then determined Olds-Olympic had no legal obligation or liability to the State for that property damage. The jury could have made such a determination had it been properly instructed on the law. But the basis for the jury's determination is unclear. We cannot know if the jury found the property damage to the groundwater did not meet MTCA levels, or if Olds-Olympic's actions were voluntary and preventative, or if Olds-Olympic remedied damage only to its own property rather than the groundwater. In the absence of instructions properly guiding the jury in its answer to interrogatory 8, a new trial must take place.

We reverse the judgment of the King County Superior Court and remand the case for a new trial

---

[21]In *Oregon Auto. Ins. Co. v. Salzberg*, 85 Wn.2d 372, 377, 535 P.2d 816 (1975), we held a late notice will release an insurer "from its responsibilities *only* if the insurer was actually *prejudiced* by the insured's actions or conduct." It is difficult to discern any prejudice to the insurers here when the information provided to the insurers was sufficient for the insurers to deny a defense and coverage to Olds-Olympic.

confined to the issue of Olds-Olympic's legal liability to the State, and damages, if any.[22]

DURHAM, C.J., DOLLIVER, SMITH, JOHNSON, MADSEN, and ALEXANDER, JJ., and PEKELIS, J. Pro Tem., concur.

GUY, J. (concurring) — The comprehensive general liability insurance policies at issue insure against the risk of *liability* incurred by the policy-holder. However, because of the "owned property" exclusions, the insurance contracts do not apply to pay for damage to the policyholder's own property. Such simple propositions become quite complex in the context of pollution liability claims. If an insured has to clean up its own land, then there may be liability under the model toxic control act (MTCA), RCW 70.105, but there is no coverage if the *only* damage is to the property of the insured because of the "owned property" exclusion. Conversely, if there was damage to the property of another (i.e., groundwater), but that damage was not severe enough to trigger liability, then there is no coverage because there is no "legal obligation" on the part of the policyholder to clean up such damage. In order for there to be insurance coverage, there must have been both (1) damage to the property of another,[23] and (2) that damage must have been the event which imposed liability on the policyholder.

---

[22]A remand for new trial confined to particular issues is merited where the error pertains to a particular issue only and justice does not require resubmission of the entire case to the jury. *Mina v. Boise Cascade Corp.*, 104 Wn.2d 696, 707, 710 P.2d 184 (1985); *McCurdy v. Union Pac. R.R.*, 68 Wn.2d 457, 471, 413 P.2d 617 (1966); *Godefroy v. Reilly*, 140 Wash. 650, 657, 250 P. 59 (1926). The jury decided the factual questions here separately in answer to special interrogatories. Trial on remand is properly confined to the questions of legal liability and damages, if any. Moreover, if Olds-Olympic prevails on the question of legal liability, it is free to assert entitlement to attorney fees pursuant to *Olympic Steamship Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 54, 811 P.2d 673 (1991), and *McGreevy v. Oregon Mut. Ins. Co.*, 128 Wn.2d 26-27, 904 P.2d 731 (1995).

[23]An immediate threat of damage to the property of another may suffice to trigger coverage, but that issue is not before the court in this case. There is a split of authority on this issue. *See* Eugene I. Annis, *The Owned Property and Care Custody and Control Exclusions of the Comprehensive General Liability Policy*, 28 GONZ. L. REV. 439 (1993).

The specific question here was whether Olds-Olympic was liable under the MTCA for remediation of the groundwater. If it was liable, then to the extent that the cleanup costs were incurred for that remediation, there would be coverage under the liability insurance policies.

The questions which were necessary to be answered in this case (after the questions of occurrences and policy dates were established) were:

(1) Was there damage to the property of another? The jury found that there was damage to groundwater. Hence, on remand, the parties need not ask this question again. As the majority correctly holds, in Washington, as a matter of law, groundwater is the property of another.

(2) Was the damage to the groundwater severe enough to impose a legal obligation on Olds-Olympic to remediate that damage under the MTCA? This question remains to be answered. Although this is a very close issue, I concur with the majority's decision that the interrogatory[24] posed on this issue was unclear. The primary problem with the interrogatory is that it did not ask whether Olds-Olympic had a legal obligation to remediate the damage to the groundwater and it did not clearly tie that obligation to the requirements of the applicable statute. On remand, the jury will need to know what level of pollution of groundwater would mandate cleanup under the MTCA and what level of pollution to the groundwater actually occurred on this property.

If the jury determines that the damage to the groundwater was severe enough to impose a legal obligation on Olds-Olympic to clean up the damage, then the question will become to what extent the cleanup efforts were directed toward remediation of the groundwater and to what extent the remediation efforts were only to clean up Olds-Olympic's own soil. I believe the most significant law made by the majority opinion is found in footnote 20. The ma-

---

[24]The interrogatory to the jury asked, "Was there a legal obligation or liability because of property damage to groundwater for any year?" Clerk's Papers at 828.

jority states that "[u]nder any CGL policy, only those portions of cleanup costs necessary to prevent further degradation of property belonging to another will be covered, given the owned property exclusion. Any portion of the cleanup affecting only the insured's property would still be subject to such an exclusion." Majority at 480 n.20. I agree. This proposition is supported by recent case law and scholarly comment and may be a significant factual issue in the present case. The Ninth Circuit has explained that the trier of fact must determine what expenses were incurred to remedy existing damage to third-party property or to prevent further damage to that property from contaminants introduced by the policyholder, and what expenses were incurred only to remedy damage to property which the policyholder controlled. The former expenses are covered by the CGL policy while the "owned property" exclusion bars coverage for the latter. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1566 (9th Cir. 1991).

Although this apportionment rule is easy to articulate in the abstract, the proof necessary to segregate such liability between the insurer and the policyholder may be quite complex. How to allocate or apportion damages for cleanup expenses when remediation has occurred both to remediate damage to the property of another (the groundwater) and to remediate soil on the policyholder's own property is a widely discussed issue with important ramifications. *See, e.g.,* Tod I. Zuckerman & Mark C. Raskoff, Environmental Insurance Litigation § 7.05, at 7–7 to –8 (1994); Kenneth S. Abraham, Environmental Liability Insurance Law 169-72 (1991); Mitchell L. Lathrop, Insurance Coverage for Environmental Claims § 3.08[1], at 3–106 to –113 (1992); Kirby Griffis, Note, *Apportionment of Environmental Cleanup Costs under the Owned-Property Exclusion in CGL Insurance Policies*, 80 Va. L. Rev. 1351 (1994); Eugene I. Annis, *The Owned Property and Care Custody and Control Exclusions of the Comprehensive General Liability Policy*, 28 Gonz. L. Rev. 439 (1993); 7A John A. Appleman, Insurance Law

AND PRACTICE § 4526 (Supp. 1994); PRODUCTS, GENERAL LIABILITY, AND CONSUMER LAW COMMITTEE, AMERICAN BAR ASSOCIATION, REFERENCE HANDBOOK ON THE COMPREHENSIVE GENERAL LIABILITY POLICY: COVERAGE PROVISIONS, EXCLUSIONS, AND OTHER LITIGATION ISSUES 130–31 (Peter J. Neeson ed., 1995). If the trier of fact determines that Olds-Olympic was liable for remediation of groundwater, then on remand the trier of fact will also need to apportion the costs of the cleanup expenses between these two relevant categories.

Reconsideration denied October 3, 1996.